# EXHIBIT A

Michael Merriman (SBN 234663)
mmerriman@hilgersgraben.com
HILGERS GRABEN PLLC
655 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 369-6232
Facsimile: (402) 413-1880

*Attorneys for Plaintiff
Daniel Nasr and the Proposed Class*

Assigned for All Purposes
Judge Randall Sherman
Dept. CX105

# SUPERIOR COURT OF CALIFORNIA

# COUNTY OF ORANGE

| | |
|---|---|
| DANIEL NASR,<br><br>Plaintiff,<br><br>v.<br><br>JETBLUE AIRWAYS CORPORATION,<br><br>Defendant. | Case No.: 30-2023-01343576-CU-AT-CXC<br>_____<br><br>CLASS ACTION<br><br>**PLAINTIFF'S COMPLAINT**<br><br>Jury Trial Demanded |

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

Plaintiff Daniel Nasr, on behalf of himself and all others similarly situated, sues Defendant JetBlue Airways Corporation ("JetBlue"), and alleges as follows:

## INTRODUCTION

1.      This is a class action lawsuit filed to redress injuries that Plaintiff and a class of consumers have suffered as a result of JetBlue's failure to properly refund fees upon cancellation of an airline ticket, in breach of JetBlue's contract of carriage. *See* Exhibit 1.

2.      When a passenger purchases an airline ticket from JetBlue, the passenger pays various taxes and fees in addition to the fare price. The fees paid when purchasing an airline ticket include a security service fee, as outlined in 49 C.F.R. § 1510.5(a) ("September 11 Security Fee").

1

3.      When that passenger cancels their nonrefundable airline ticket issued by JetBlue, JetBlue provides any refund in the form of a JetBlue Credit, which can only be used for a future JetBlue air-only reservation. Additionally, Credits typically expire one year from the date of issuance.

4.      A passenger who cancels his JetBlue ticket and does not travel does not owe the September 11 Security Fee. However, a JetBlue passenger who cancels a nonrefundable ticket receives a refund of the September 11 Security Fee in the form of a Credit instead of a refund to the original form of payment.

5.      JetBlue's practice of refunding unused September 11 Security Fees in the form of a Credit, rather than to the passenger's original form of payment, violates the terms of the governing contract between JetBlue and Plaintiff (and all class members).

## PARTIES, JURISDICTION, AND VENUE

6.      Plaintiff Daniel Nasr is an individual who is domiciled in, and is a citizen of, California. He resides in Orange County.

7.      Defendant JetBlue Airways Corporation is a Delaware corporation with its principal place of business in New York.  JetBlue routinely conducts business in the State of California, enters into contracts with California residents, and it has a registered agent in California.

8.      This is an action for breach of contract. Accordingly, jurisdiction for this claim is conferred to this Court pursuant to, inter alia, Cal. Code Civ. Proc., § 410.10.

9.      Venue is proper in under Cal. Code Civ. Proc., § 395 because Plaintiff is a resident of Orange County, and Plaintiff resided in Orange County and entered into a contract with JetBlue there.

10.     All conditions precedent to the bringing of this action have occurred, or JetBlue has waived them.

## FACTUAL ALLEGATIONS

11.     Plaintiff purchased a JetBlue flight in March of 2020.

12.     Plaintiff paid a total of $185.95 in fare, taxes, and fees for the flight. Payment included the security service fee required by 49 C.F.R. § 1510.5(a).

2

13. Before his departure date, Plaintiff cancelled his flight. He received a JetBlue Credit to be used for a future JetBlue air-only reservation. The amount of the credit included the price of the flight as well as the taxes and fees (including the September 11 Security Fee). No portion of the fare, taxes, and fees Plaintiff paid was returned to his original form of payment.

14. JetBlue's contract of carriage states that "[a]ll transportation is sold and all carriage is performed subject to compliance with all applicable government laws and regulations, including those of the Federal Aviation Administration and the U.S. Department of Transportation, Transportation Security Administration, and all applicable conventions, special contracts, treaties, and tariffs, many of which are not specified herein but are nevertheless binding on Carrier and all Passengers." *See* Ex. 1 at 37.

15. JetBlue's contract of carriage additionally provides that "United States federal law shall govern any matter relating to or arising under this Contract of Carriage. To the extent any such matter is not preempted by federal law, the laws of the State of New York shall apply, without regard to conflict of laws principles." *See* Ex. 1 at 55.

16. Thus, JetBlue's contract of carriage expressly states that all relevant provisions of federal law are binding on JetBlue and that it is governed by all relevant provisions of federal law.

17. Federal law requires that airlines impose a September 11 Security Fee "of $5.60 per one-way trip for air transportation originating at an airport in the United States." 49 C.F.R. § 1510.5(a).

18. Under federal law, airlines must collect the September 11 Security Fee, which "must be based on the air travel itinerary at the time the air transportation is sold. Any changes by the passenger to the itinerary are subject to additional collection or refund of the security service fee by the direct air carrier or foreign air carrier, as appropriate." 49 C.F.R. § 1510.9(b).

19. Federal law also provides that airlines have "neither legal nor equitable interest in the security service fees except for the right to retain any accrued interest on the principal amounts collected pursuant to § 1510.13(b)." 49 C.F.R. § 1510.11(b).

20. Airlines have a responsibility to "remit all security service fees imposed each calendar month to TSA," but airlines are "prohibited from retaining any portion of the principal to

3

1    offset the costs of collecting, handling, or remitting the passenger security service fees." 49 C.F.R.

2    § 1510.13(a), (c).

3         21.    When a passenger does not travel on their JetBlue ticket, JetBlue does not owe the

4    September 11 Security Fee to the TSA, as per 49 C.F.R. § 1510.5(a). Instead, JetBlue is required

5    by 49 C.F.R. § 1510.9(b) to refund to the passenger the September 11 Security Fee.

6         22.    JetBlue is not entitled to retain unused September 11 Security Fees from passengers

7    who did not travel on their JetBlue tickets, as per 49 C.F.R. §§ 1510.11(b) and 1510.13(c).

8         23.    However, it is JetBlue's practice not to refund September 11 Security Fees to the

9    original form of payment for passengers who did not travel on their JetBlue nonrefundable ticket,

10   including Plaintiff.

11        24.    Instead, JetBlue addresses the cost for all fares, taxes, and fees—including the

12   September 11 Security Fee—in the form of JetBlue Credit. JetBlue Credit can only be used for a

13   future air-only reservation, and it typically expires one year after issuance. This Credit is not, in

14   any manner, the "refund" that the governing law requires.

15        25.    JetBlue Credit is not equivalent to a refund to the passenger's original form of

16   payment. The Credit can only be used for a future JetBlue air-only reservation. Therefore, a Credit

17   requires that the passenger use that money for travel on JetBlue and within a specified timeframe;

18   if the passenger cannot or chooses not to travel on JetBlue within the specified time period, they

19   lose that money, and JetBlue improperly retains unused September 11 Security Fees. A refund to

20   the original form of payment, on the other hand, allows passengers to use the funds originally paid

21   to JetBlue for the September 11 Security Fees for anything they wish.

22        26.    Thus, by converting September 11 Security Fees to a Credit when a nonrefundable

23   flight is cancelled, JetBlue is violating its contract with passengers.

24        27.    By stating that it is governed by United States federal law and bound by applicable

25   government laws and regulations (even if all such provisions are "not specified" in the contract),

26   JetBlue's contract of carriage includes the requirements of 49 C.F.R. §§ 1510.5(a), 1510.9(b),

27   1510.11(b), and § 1510.13(a), (c).

28

CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL

28.     By returning unused September 11 Security Fees in the form of Credits rather than to the original payment method (*i.e.*, a cash refund), JetBlue breached its obligations under federal law and its contract of carriage.

29.     Secondary sources providing interpretation of the relevant provisions confirm this obligation. The U.S. Government Accountability Office ("GAO") issued a report called "Consumers Could Benefit from Better Information about Airline-Imposed Fees and Refundability of Government-Imposed Taxes and Fees" in 2010. The GAO report stated that "consumers with unused nonrefundable tickets with expired or lost value are entitled to a full refund of the September 11th Security Fee." Report at 2.

30.     The TSA likewise issued industry guidance in November 2002 regarding September 11 Security Fee refunds. The TSA stated that "[w]hen a ticket purchaser does not use a ticket for air transportation and the ticket then expires or loses its value, the September 11th security fee involved is subject to a refund by the collecting carrier to the ticket purchaser."

31.     Building off of the previous guidance, the TSA also issued industry guidance in March 2020 regarding refunds of the September 11 Security Fee. There, the TSA stated that "[r]etaining any portion of the fee or providing credit towards future services, with or without an expiration, does not constitute a refund."

32.     By failing to comply with the federal requirements to issue refunds of unused September 11 Security Fees, JetBlue breached its contract of carriage with Plaintiff.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this lawsuit as a class action pursuant to Cal. Code Civ. Proc., § 382.

34.     **Class Definition**. The Class consists of and is defined as all United States citizens including Plaintiff who: (a) on or after March 1, 2014, (b) purchased a nonrefundable JetBlue ticket and subsequently cancelled that ticket, and (c) received a Credit including all fare, taxes, and fees in the form of a Credit. The Class period will be from March 1, 2014, to the date of class certification (hereinafter the "Class Period"). JetBlue's contract of carriage, applicable to all Class Members, has a uniform choice of law clause applying federal law and, when not in conflict, the

5

laws of New York, making a nationwide class appropriate, as identical law governs each Class Member's claims, and each class member is subject to the same contract.

35.     Plaintiff reserves the right to amend the Class Definition and/or add additional sub-class definitions as discovery proceeds and to conform to the evidence.

36.     Excluded from the Class is JetBlue, its agents, representatives, and employees; and any judge to whom this action is assigned and any family member of that judge's staff and immediate family.

37.     While the exact number of Class members is unknown at this time, Plaintiff submits that based upon information and belief, there are thousands of individuals throughout the United States who are potential Class members in this action. Individual joinder of Class members is impracticable. Further, the disposition of the claims of the Class in a single action will provide substantial benefits to all parties and to the Court.

38.     Plaintiff further alleges that the members of the Class will be ascertainable through JetBlue's electronic records, data, and databases.

39.     There are common questions of law and/or fact shared by Plaintiff and each member of the Class. These common questions of law and/or fact include the following:

    a.      Whether JetBlue breached its contract with Plaintiff and Class members by failing to refund September 11 Security Fees to the original form of payment;

    b.      Whether JetBlue's contract of carriage with Plaintiff and Class Members permits JetBlue to include September 11 Security Fees in the form of Credits; and

    c.      Whether JetBlue's conduct caused injury to Plaintiff and Class Members.

40.     The common questions of law and/or fact predominate over questions that may affect only individual members.

41.     Plaintiff's claims are typical of the claims that would be asserted by other members of the Class in that, in proving his claims under the contract, he will simultaneously prove the claims of all Class members. The rights afforded under the contract are the same for Plaintiff and Class members.  Each Class Member received a Credit (including of the September 11 Security

CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL

1  Fee), as JetBlue's failure to refund September 11 Security Fees to the original form of payment was
2  uniform during the Class Period.

3      42.     There is no plain, speedy, or adequate remedy other than by maintenance of this
4  class action since Plaintiff is informed and believes that the damage to each Plaintiff is relatively
5  small, in that the September 11 Security Fee is $5.60 per one-way trip, making it economically
6  unfeasible to pursue remedies other than a class action. Consequently, there would be a failure of
7  justice but for the maintenance of the present class action.

8      43.     Plaintiff is a Class Member.  He is an adequate representative of the Class because
9  his interests do not conflict with the interests of other Class members, and he will fairly and
10 adequately protect the interests of the Class members. Additionally, Plaintiff is cognizant of his
11 responsibility as a Class representative and has retained experienced counsel fully capable of, and
12 intent upon, vigorously pursuing the action.  Class counsel have extensive experience in class action
13 litigation.

14     44.     Plaintiff's cause of action against JetBlue may be maintained as a class action
15 pursuant to Cal. Code Civ. Proc., § 382 because the questions here are of a common interest, there
16 are numerous parties, the class members are readily ascertainable, and it is impracticable to bring
17 them all before the Court.

18                          **FIRST CAUSE OF ACTION**

19                          **BREACH OF CONTRACT**

20                          (By Plaintiff against Defendant)

21     45.     Plaintiff re-alleges paragraphs 1-44 as if fully set forth herein and further alleges the
22 following.

23     46.     This is a count for breach of contract. Plaintiff brings the First Cause of Action
24 individually and for the Class defined above.

25     47.     JetBlue's contract of carriage states that "[a]ll transportation is sold and all carriage
26 is performed subject to compliance with all applicable government laws and regulations, including
27 those of the Federal Aviation Administration and the U.S. Department of Transportation,
28 Transportation Security Administration, and all applicable conventions, special contracts, treaties,

7

1 | and tariffs, many of which are not specified herein but are nevertheless binding on Carrier and all

2 | Passengers." *See* Ex. 1 at 37.

3 |     48.    JetBlue's contract of carriage also provides that "United States federal law shall

4 | govern any matter relating to or arising under this Contract of Carriage. To the extent any such

5 | matter is not preempted by federal law, the laws of the State of New York shall apply, without

6 | regard to conflict of laws principles." Ex. 1 at 55.

7 |     49.    The contract of carriage is therefore governed by federal law, including those laws

8 | codified in the Code of Federal Regulations. JetBlue has explicitly agreed to be bound by those

9 | laws.

10 |     50.    49 C.F.R. § 1510.5(a) requires that airlines impose "a security service fee of $ 5.60

11 | per one-way trip for air transportation originating at an airport in the United States."

12 |     51.    49 C.F.R. § 1510.9(b) states that airlines must collect the security service fee, and it

13 | "must be based on the air travel itinerary at the time the air transportation is sold. Any changes by

14 | the passenger to the itinerary are subject to additional collection or refund of the security service

15 | fee by the direct air carrier or foreign air carrier, as appropriate."

16 |     52.    49 C.F.R. § 1510.11(b) provides that airlines have "neither legal nor equitable

17 | interest in the security service fees except for the right to retain any accrued interest on the

18 | principal amounts collected pursuant to § 1510.13(b)."

19 |     53.    49 C.F.R. § 1510.13 states that airlines have a responsibility to "remit all security

20 | service fees imposed each calendar month to TSA," but airlines are "prohibited from retaining any

21 | portion of the principal to offset the costs of collecting, handling, or remitting the passenger

22 | security service fees." 49 C.F.R. § 1510.13(a), (c).

23 |     54.    The contract of carriage constitutes a contract between JetBlue and each Class

24 | member, including Plaintiff.

25 |     55.    Plaintiff and each Class member performed their obligations pursuant to the contract

26 | of carriage.

27 |     56.    JetBlue's failure to refund Plaintiff's and Class members' September 11 Security

28 | Fees to their original form of payment violates 49 C.F.R. § 1510.9(b), 49 C.F.R. § 1510.11(b), and

8

1    49 C.F.R. § 1510.13(c)—which govern the contract and by which JetBlue has agreed to be

2    bound—and thereby represents a breach of the applicable contract. As stated herein, the provision

3    of a flight Credit is not a refund, and provision of the Credit breaches the contract.

4        57.    As a result of this breach, Plaintiff and Class members suffered damages in the form

5    of unrefunded September 11 Security Fees.

6                                **PRAYER FOR RELIEF**

7        Named Plaintiff and the class request the following relief:

8            a.  Certification of the Class;

9            b.  A judgment against JetBlue;

10           c.  Actual damages suffered by Plaintiff and the Class;

11           d.  The costs of suit, including reasonable attorney's fees and pre-judgment and post-

12               judgment interest as provided by law;

13           e.  Such other relief as the Court deems just and proper;

14           f.  Plaintiff demands a jury on all claims so triable.

15

16

17   Date: August 21, 2023                      Respectfully submitted,

18

19                                              /s/ *Michael Merriman*
                                                Michael Merriman (SBN 234663)
20                                              HILGERS GRABEN PLLC
                                                655 West Broadway, Suite 900
21                                              San Diego, CA 92101
                                                Telephone: 619.639.6232
22                                              mmerriman@hilgersgraben.com

23
                                                *Attorney for Plaintiff Daniel Nasr*
24                                              *and the Proposed Class*

25

26

27

28

                                        9

# EXHIBIT 1

# JetBlue Airways
# Contract of Carriage

*(Revised, January 16, 2020)*

Domestic transportation and international transportation by JetBlue Airways Corporation ("Carrier" or "JetBlue") is subject to the terms and conditions contained in this Contract of Carriage and, where applicable, also subject to treaties, government regulations, and tariffs on file with the U.S. Department of Transportation, as well as any terms, conditions, and/or restrictions applicable to your booking channel. If your itinerary involves travel on a flight operated by a JetBlue Codeshare Partner (as defined below), please see Section 35. If your itinerary involves travel on a flight operated by a JetBlue interline partner, please see Section 36. By making a reservation or accepting transportation on Carrier, each Passenger (as defined below) agrees to be bound by all of the following terms and conditions.

## 1.    <u>Definitions</u>

**Assistive Device** refers to any piece of equipment that assists an Individual with a Disability to cope with the effects of his or her disability, and may include medical devices and medications.

**Battery-Powered Mobility Aid** refers to an assistive device used by individuals with mobility impairments such as a wheelchair, scooter or a Segway when it is used as a mobility device by a person with a mobility-related disability.

**Blue Fare, Blue Basic Fare, Blue Plus Fare, Blue Extra Fare, and Blue Flex Fare** refer to fare options offered for purchase. Details regarding fare options are available at www.jetblue.com/fares.

**Carriage** refers to the transportation of passengers and/or baggage by air, together with any related services of Carrier in connection with such transportation.

**Carrier** means JetBlue Airways Corporation.

**Codeshare Partner** means another airline operating a flight on which Carrier has placed its airline designator code, "B6."

**Confirmed Reservation** means a space on a specific date and on a specific flight and in a specific class of service of Carrier which has been requested by a Passenger, including a Passenger with a "Zero Fare Ticket," and which Carrier or its agent has verified, by appropriate notation on the ticket or in any other manner

provided therefore by Carrier, as being reserved for the accommodation of the Passenger.

**Controllable Irregularity** as used in Section 37, means a delay, cancellation or diversion that is not caused by a Force Majeure Event. For the sake of clarity, if in a chain of multiple events, the original irregularity is due to a Force Majeure Event, the cause of the subsequent event(s) reasonably related to the original irregularity shall be deemed an Uncontrollable Irregularity.

**Convention** means, whichever of the following applies:

> Convention for the Unification of Certain Rules Relating to International Carriage By Air, signed at Warsaw, October 12, 1929 ("Warsaw Convention").

> Warsaw Convention, as Amended at the Hague, 1955 ("Hague Protocol").

> Warsaw Convention, as Amended at the Hague, 1955 and by Protocol No. 4 of Montreal, 1975 ("Montreal Protocol No. 4").

> Convention for the Unification of Certain Rules for International Carriage By Air done at Montreal 1999 ("Montreal Convention").

**Credit** shall mean a credit in a specified dollar amount valid for one (1) year from the date of issuance. A Credit must be used (travel booked and flown) within one (1) year from date of issuance. Credits are non-transferable unless otherwise stated herein.

**Departure Delay**, as used in Sections 37 and 38, means a delay prior to pushback from the Gate.

**Emotional Support Animal or Psychiatric Service Animal** refers to an animal that is shown by documentation to be necessary for the emotional wellbeing of a Qualified Individual with a Disability or to provide assistance to such person.

**Force Majeure Event** means an event(s) outside of JetBlue's reasonable control which includes, but is not limited to, weather conditions; acts of government or airport authorities (e.g., Air Traffic Control Delays, runway closures, airport construction); acts of God; U.S. military or airlift emergency or substantially expanded U.S. military airlift requirements, as determined by the U.S. government; grounding of a substantial number of aircraft as a result of activation of the U.S. Civil Reserve Air Fleet; strikes or labor unrest; civil commotions, embargoes, wars or other hostilities, whether actual, threatened or reported; government regulation, demand or requirement; damage to aircraft caused by a third-party; emergency situation requiring care, protection or response to protect

2

person or property or any event that is not reasonably foreseen, predicted or anticipated by JetBlue.

**Gate** means either where a plane loads or deplanes Passengers into a terminal building via a jetbridge or, in the case of a hardstand, via a people mover, bus, or air stairs.

**Ground Delay**, as used in Section 37, means a delay involving a flight that, in the case of departures, has boarded and pushed back from the Gate but that is not in the air and, in the case of arrivals, has landed but has not yet arrived at a Gate. In the case of compensation issued pursuant to the Customer Bill of Rights under Section 37, this does not include flights that were diverted or forced to make an unscheduled stop.

**Individual with a Disability** is an individual or Passenger who:

(a) has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities,

(b) has a record of such an impairment, or

(c) is regarded as having such an impairment, as further defined in U.S. Department of Transportation regulations in 14 CFR Part 382.3.

**Interline Transportation** means carriage on more than one carrier where carriers agree to accept each other's tickets and baggage.

**Mint** refers to Carrier's premium service. Details regarding Mint service are available at http://www.jetblue.com/flying-on-jetblue/mint/.

**Non-Revenue Passenger** is a Passenger, who is traveling on a JetBlue travel certificate, an employee pass, a travel pass issued to JetBlue employees for transfer to family and friends (known as a "Buddy Pass"), a JetBlue frequent flyer program award (known as a "TrueBlue Award" or "True Pass"), VIP pass, Travel Card, other airline employees traveling free of charge or at a reduced rate.

**Passenger** is any person, except members of the crew working the flight, who enters into a contract of transportation or other agreement (or for whom a contract of transportation or other agreement is entered into) with Carrier by which the person is to be transported in an aircraft with the consent of Carrier. A person who is identified, at any time and in any way, as a knowing participant in the commission of a War Risk Occurrence shall not be considered to be a "Passenger" for the purposes of this Contract of Carriage.

Rev. 01/16/2020

**Qualified Individual with a Disability** means a Passenger or individual with a disability who:

(a) with respect to accompanying or meeting a traveler, use of ground transportation, use of terminal facilities or obtaining information about schedules, fares or policies, takes those actions necessary to avail himself or herself of facilities or services offered by Carrier to the general public, with reasonable accommodations, as needed, provided by Carrier;

(b) with respect to obtaining a reservation for air transportation on Carrier, offers or makes a good faith attempt to offer to purchase or otherwise to validly obtain a reservation;

(c) with respect to obtaining air transportation on other services or accommodations required by U.S. Department of Transportation regulations in 14 CFR Part 382:

(1) purchases or possesses a valid reservation for air transportation on Carrier and presents himself or herself at the airport for the purpose of traveling on the flight for which the ticket has been purchased or obtained;

(2) meets reasonable, nondiscriminatory Contract of Carriage requirements applicable to all Passengers; and

(3) whose carriage will not violate the requirements of Federal Aviation Regulations or, in the reasonable expectation of Carrier personnel, jeopardize the safe completion of the flight or the health or safety of other persons.

**Service Animal** refers to any animal that is individually trained or is shown to have an innate ability to provide assistance to a Qualified Individual with a Disability.

**Stopover** refers to a deliberate interruption of a journey by a Passenger, scheduled to exceed four (4) hours, at a point between the place of departure and the final destination.

**Tariffs** mean the international passenger rules tariffs publicly filed with the U.S. Department of Transportation.

**Uncontrollable Irregularity**, as used in Section 37, means a delay, cancellation or diversion that is caused by a Force Majeure Event. For the sake of clarity, if in a chain of multiple events, the original irregularity is due to a Force Majeure Event, the cause of the subsequent event(s) reasonably related to the original irregularity shall be deemed an Uncontrollable Irregularity.

Rev. 01/16/2020

**Zero Fare Ticket** means a ticket acquired without a substantial monetary payment such as by using frequent flier miles or vouchers, or a consolidator ticket obtained after a monetary payment that does not show a fare amount on the ticket. A Zero Fare Ticket does not include free or reduced rate air transportation provided to employees and guests.

## 2.   Nature of Contract

This Contract of Carriage applies to and governs Carrier's routes only. No agent, servant or representative of Carrier has authority to change or waive any provision of this Contract of Carriage, unless authorized in writing by a corporate officer of Carrier. Unless otherwise prohibited by law, this Contract constitutes the entire agreement between Carrier and Passenger or the party on behalf of whom this contract was entered.

## 3.   Reservations

A.   All reservations on Carrier are confirmed and delivered electronically.

B.   No person shall be entitled to transportation without a valid, Confirmed Reservation. No reservation shall be considered a Confirmed Reservation if purchase is not completed at least thirty (30) minutes prior to scheduled departure and until payment in full has been received. No reservation paid by credit card shall be considered a Confirmed Reservation if the transaction is not accepted by Carrier for any reason, whether or not Passenger is notified that the reservation has been cancelled.

C.   Name changes are only permitted in the case of refundable fares.  All other reservations are non-transferable and non-assignable. Non-refundable fares may only be used by the Passenger named on the reservation at the time the reservation is made.

D.   Carrier reserves the right to refuse carriage to any person who has acquired a reservation in violation of applicable law or Carrier's rules and regulations, or without legal capacity to contract.

E.   Seat assignments are not guaranteed and are subject to change without notice. Passenger may not occupy a seat other than the seat(s) to which Passenger is assigned except when so authorized or instructed by crewmembers on duty.

Rev. 01/16/2020

4.   **Changes, Cancellations, and Refunds**

   A.   Non-Refundable Fares:

   (1)  Changes: Non-refundable fares, with the exception of Blue Basic
        Fares, may be changed prior to the scheduled departure time
        subject to availability, for up to a Two Hundred Dollar ($200)
        change fee and any applicable fare difference.

   (2)  Cancellations: Non-refundable fares, with the exception of Blue
        Basic Fares, may be cancelled prior to the scheduled departure
        time for a Credit for future air-only travel on Carrier. Refunds are
        not allowed. Credit is subject to up to a Two Hundred Dollar ($200)
        service fee. Credit may be used to book a new air-only reservation
        on Carrier in the name of the Passenger or in the name of any
        other person designated by the Passenger. Failure to cancel prior
        to scheduled departure will result in the cancellation of all
        remaining segments associated with the reservation and forfeiture
        of fare and any fees for ancillary products or services purchased.
        In the event of cancellation of a non-refundable fare, taxes and
        fees will be included in the Credit where permitted by applicable
        law.  Taxes and fees will not be refunded except when required by
        applicable law and, where permitted, only upon written request by
        Passenger.

   (3)  Standby Travel: In the case of reservations for non-refundable
        fares, with the exception of Blue Basic Fares, for travel that does
        not involve (i) a change in departure city or arrival city, or (ii) a
        change between a JetBlue-operated flight and a JetBlue flight that
        contains a segment operated by a Codeshare Partner or interline
        partner, Passengers may change their reservation to standby
        travel for the flight immediately preceding their original departure
        with payment of an additional service fee.  Passengers may not
        change their reservation to standby travel for the flight immediately
        preceding their original departure if such a change would result in
        changing the date of travel, a change in the departure city or arrival
        city, or a change between a JetBlue-operated flight and a JetBlue
        flight that contains a segment operated by a JetBlue Codeshare
        Partner or interline partner.

   (4)  Following receipt of payment from a Passenger, JetBlue will allow
        a reservation to be held at the quoted fare for twenty-four (24)
        hours, if the reservation is made at least one week prior to the
        flight's departure. If such reservation is canceled within twenty-four
        (24) hours of booking, Passenger will receive a full refund without
        assessment of a cancellation fee.

Rev. 01/16/2020

B.   Federal Government Fares:

    (1)   Changes: Fully refundable Federal Government Fares may be changed at any time subject to availability and any applicable fare difference.

    (2)   Cancellations: Fully refundable Federal Government Fares may be cancelled at any time and Passenger will receive a full refund. Fare refunds will be made by Carrier to the original form of payment.

    (3)   Refunds: Refunds shall be made by Carrier to the original form of payment, except that when a portion of the trip has been made, the refund will be made in an amount equal to the applicable one-way fare (less any applicable discount) for the portion of the trip cancelled or not operated as scheduled by Carrier.

C.   Refundable Fares:

    (1)   Changes: The fare paid for a Passenger who purchases a fully refundable ticket may be changed at any time prior to scheduled departure, subject to availability and any applicable fare difference. If the reservation is not changed prior to scheduled departure, all money associated with the fare will be a Credit valid for future travel on JetBlue.

    (2)   Cancellations: Reservations for refundable fares may be cancelled at any time prior to scheduled departure and Passenger will receive a full refund. Failure to cancel prior to scheduled departure will result in the cancellation of all remaining segments associated with the reservation and all money associated with the fare will be a Credit valid for future travel on JetBlue.

    (3)   Refunds: For Passengers who are eligible to receive a refund under this Section, refunds shall be made by Carrier to the original form of payment, except that when a portion of the trip has been made, the refund will be made in an amount equal to the applicable one-way fare (less any applicable discount) for the portion of the trip cancelled or not operated as scheduled by Carrier.

D.   Combined Fares: Where one leg of a fare is ticketed as a refundable fare and another leg of a fare is ticketed as a non-refundable fare, the applicable refund and cancellation policies for refundable fares will apply only to the refundable portion and the applicable refund and cancellation policies for the non-refundable fare will apply to the non-refundable portion.

Rev. 01/16/2020

E. Failure of a Passenger to adhere to the following time requirements may result in the cancellation of the Passenger's reservation, seat assignments and forfeiture of payment:

  (1)  For domestic travel:

    (a)  Passengers traveling without checked baggage must have obtained a boarding pass thirty (30) minutes prior to scheduled departure;

    (b)  Passengers traveling with checked baggage must have obtained a boarding pass and have dropped off their baggage forty (40) minutes prior to scheduled departure; and

    (c)  All Passengers must be onboard the aircraft fifteen (15) minutes prior to scheduled or posted aircraft departure time.

  (2)  For international travel:

    (a)  Passengers traveling with or without checked baggage must have obtained a boarding pass and have dropped off their baggage sixty (60) minutes prior to scheduled departure; and

    (b)  All Passengers must be onboard the aircraft fifteen (15) minutes prior to the scheduled or posted aircraft departure time.

F. Carrier will refuse to honor any reservation when such action is reasonably deemed to be necessary to comply with applicable governmental regulations or requests.

G. Except in the case of Federal Government Fares, when a round trip or multi-segment reservation has been made and the Passenger fails to honor his or her reservation for the first portion of the trip, Carrier will cancel, without notification, the return portion or the continuing portion of the Passenger's reservation and Passenger forfeits any remaining fare.

H. If part of your itinerary involves travel on an interline partner, please see Section 36 for information regarding changes, cancellations and refunds.

Rev. 01/16/2020

**5.    Group Reservations**

Reservations must be made through Carrier's Group Desk when ten (10) or more Passengers are booked as a group traveling on the same itinerary. Refundable fares are not available for group reservations. If a group reservation is canceled within twenty-four (24) hours of booking and such reservation is made one week or more prior to the flight's departure, payment will be refunded in full without assessment of a cancellation fee.  Such refund will include any deposit that a party or individual is required to make at the time of booking. Such group reservations are subject to all applicable group policies and procedures established by Carrier.

**6.    Fares**

A.    Transportation on Carrier is subject to the fares, taxes and charges in effect on the date on which the Confirmed Reservation was made. If the reservation has been confirmed and e-ticket issued before an increase in the fare becomes effective, the reservation shall be honored for transportation as purchased. If the fare decreases after a Confirmed Reservation has been made and e-ticket issued, Carrier will not refund, credit or make any adjustment to the original fare.

B.    Fares apply only between the points named and via the routing as shown in Carrier's current schedule and are not applicable to or from intermediate points.

C.    Carrier has non-refundable fares and refundable fares. Refundable fares may not be available on all flights.  Refundable fares are not available for group reservations (as further explained in Section 5). Refundable Federal Government Fares are available only to travelers who utilize a SmartPay government issued credit card or GTRs. Federal Government Fares are not available to the general public.

D.    No Stopovers are permitted on published fares, except upon combination of local fares.

E.    Carrier does not offer special fares for infants, children, senior citizens, military personnel or any other category of passenger, except Federal Government employees.

F.    Carrier reserves the right to collect additional taxes, fees or charges imposed by a governmental entity after the reservation has been made and paid for, but before transportation commences.

Rev. 01/16/2020

### 7.    **Unaccompanied Minors**

A.   Carrier will not allow any child under the age of five (5) years to travel on any flight unless accompanied by a Passenger fourteen (14) years of age or older.

B.   Subject to an additional fee, unaccompanied children between the ages of five (5) and under fourteen (14) years will be accepted by Carrier, provided the child has a Confirmed Reservation, and the flight on which he/she travels is a non-stop flight. Unaccompanied children will not be accepted on flights with intermediate stops or on connecting flights. The parent or adult guardian/custodian must provide Carrier with the completed Unaccompanied Minor Form, evidencing that the child will be met by another parent or adult guardian/custodian upon deplaning at his/her destination. The person meeting the child at his/her destination will be required to present positive identification and sign a release on the Form. The terms and conditions of the Form are hereby incorporated by reference.

C.   Passengers fourteen (14) years of age or older are considered adults for purposes of this Section.

D.   Carrier reserves the right to limit the number of unaccompanied minors on any flight in the interest of safety, and such determination is made solely at the discretion of Carrier. Should Carrier refuse carriage to any unaccompanied minor on this basis, no recovery is available under Section 27 or 37, but Carrier will endeavor to accommodate the unaccompanied minor on the next available flight.

E.   Carrier will assign seating to unaccompanied minors entirely at its discretion. If any additional fees were collected by Carrier for the purpose of a particular seat assignment for the unaccompanied minor, an appropriate refund will be issued.

F.   If any part of the itinerary involves travel on a Codeshare Partner, please see Section 35 and if any part of the itinerary involves travel on an interline partner, please see Section 36 for differences regarding additional requirements that may apply.

Rev. 01/16/2020

**8.** **Infants and Small Children; Child Restraint Systems**

A. Carrier encourages all adults traveling with children under the age of two (2) years to secure the child in an approved car seat or child restraint system in the child's own, purchased seat. A paying adult Passenger may carry, free of charge, on his or her lap, one child over three (3) days and under two (2) years of age. For Passengers departing from international destinations with lap infants, Carrier will collect APHIS (Department of Agriculture) and INS (Customs and Border Protection) taxes at the airport for the lap infant. Carrier reserves the right to request proof of age (e.g. passport, birth certificate or immunization record) before accepting an infant for travel as a lap child. Infants between three (3) and fourteen (14) days old must have written approval from their attending physician to travel. Carrier does not reserve a seat for such children unless a separate reservation is purchased at the regular, applicable fare.

B. If a separate reservation has been made for the child over three (3) days and under two (2) years of age, the child may travel in a separate seat, provided that the child must be securely placed in an FAA-approved child restraint system that conforms to the following guidelines:

   (1) Car seats manufactured on or after February 26, 1985 must bear two labels, (1) "THIS RESTRAINT IS CERTIFIED FOR USE IN MOTOR VEHICLES AND AIRCRAFT", in red lettering; and (2) "THIS CHILD RESTRAINT SYSTEM CONFORMS TO ALL APPLICABLE FEDERAL MOTOR VEHICLE SAFETY STANDARDS," this second statement need not be in red lettering.

   (2) Car seats manufactured between 1981 and 1985 must state "THIS CHILD RESTRAINT SYSTEM CONFORMS TO ALL APPLICABLE FEDERAL MOTOR VEHICLE SAFETY STANDARDS."

   (3) FAA approved CARES Child Restraint System must state "FAA APPROVED IN ACCORDANCE WITH 14 CFR PART 21.305(D) APPROVED FOR AIRCRAFT USE ONLY".

   (4) Booster type seats, vest and harness type child restraint systems, lap held child restraints or seats manufactured before 1981 are not acceptable for use.

   (5) Child restraint systems may not be used in an emergency exit row, aisle seat, or middle seat if the window seat is occupied.

Rev. 01/16/2020

(6) It is the responsibility of the child's parent or accompanying adult to ensure that the restraint device functions correctly, that the child is adequately secured by the device, that the child's weight does not exceed applicable limitations and that the device has been properly secured to the aircraft seat.

(7) Children may not be placed in booster seats, restraint vests, restraint harnesses and other devices not meeting the FAA requirements set forth above.

9.    **Inspection of Passengers and Baggage**

Baggage tendered for transportation either as checked baggage or as carry-on baggage is subject to inspection for security and safety reasons. Passengers and their baggage are subject to inspection with or without the Passenger's consent or knowledge.

10.    **Carry-on Baggage**

A.    All carry-on baggage must be stowed in an overhead bin or placed completely under the passenger seat directly in front of the Passenger. Carry-on baggage is the sole responsibility of the Passenger. Claims for lost, forgotten, or stolen carry-on baggage will not be accepted by Carrier.

B.    Provided there is space for its stowage at the time the Passenger boards, each Passenger is restricted to one (1) carry-on item that must be placed in the overhead bin. On all aircraft, carry-on items must not exceed external dimensions of twenty-two inches by fourteen inches by nine inches (22" x 14" x 9"), except for musical instruments as set forth in Section 10F. In addition to the one (1) carry-on item, Passenger may carry a small personal item such as a purse, briefcase, laptop computer case, small backpack, or a small camera. The personal item must fit completely under the seat in front of the Passenger. On any given flight, Carrier reserves the right to further restrict the number of carry-on items as circumstances may require.

C.    Mobility and other Assistive Devices upon which a Qualified Individual with a Disability is dependent may be carried in addition to the carry-on baggage allowance.

Rev. 01/16/2020

D. Pets

   (1) No animals are allowed to be transported on Carrier as checked baggage; however, Carrier will permit small dogs and cats to be transported by Passengers in-cabin (no other animals are allowed). Pets will not be permitted in Mint. Passengers are responsible for complying with any applicable laws and/or governmental regulations of the destination to and from which the animal is being transported, including furnishing valid health and rabies vaccination certificates when required. The charge to the Passenger for transporting a pet in-cabin is One Hundred and Twenty-Five Dollars ($125) per pet, each way. A Passenger may not transport more than one pet per flight. Payment must be made at the time the Passenger makes his or her reservation.

   (2) All in-cabin pets must be transported in an approved kennel, with only one pet per kennel.

   (3) In certain cases, search and rescue dogs may be permitted to travel on Carrier.  A fee may apply.

   (4) A maximum of four pets may travel in-cabin on any flight.

   (5) Refer to Section 34 for restrictions relating to travel to and from international destinations.

   (6) If part of your itinerary involves travel on a Codeshare Partner, please see Section 35 for differences regarding acceptance of pets.

   (7) If part of your itinerary involves travel on an interline partner, please see Section 36 for differences regarding acceptance of pets.

E. Service Animals, Emotional Support Animals and Psychiatric Service Animals

   (1) Carrier will accept Service Animals, Emotional Support Animals or Psychiatric Service Animals for use by Qualified Individuals with a Disability to accompany a Passenger on a flight at no charge. Emotional Support Animals and Psychiatric Service Animals are limited to dogs, cats and miniature horses. Only one Emotional Support Animal will be accepted per traveling Qualified Individual with a Disability. Upon request, Carrier will escort Passenger with a Service Animal, Emotional Support Animal or Psychiatric Service Animal to an animal relief area at the airport.

Rev. 01/16/2020

(2) Carrier will accept as evidence that an animal is a Service Animal the presentation of identification cards, other written documentation, presence of harnesses or markings on harnesses, tags, or the reasonably credible verbal assurances of the Qualified Individual with a Disability using the animal.

(3) Carrier requires that a Passenger traveling with an Emotional Support Animal or Psychiatric Service Animal provide 48 hours' advance notice prior to travel, and the submission at time of notice of the Medical/Mental Health Professional's Form, Veterinary Health Form and Confirmation of Animal Behavior, available for download at https://www.jetblue.com/p/FINAL_ESAN_REV_ LINKED_JUNE42018.pdf.

(4) Carrier will permit a Service Animal, a properly documented Emotional Support Animal or Psychiatric Service Animal to accompany a Passenger who is a Qualified Individual with a Disability in any seat in which the Passenger sits, unless the animal obstructs an aisle or other area that must remain unobstructed in order to facilitate an emergency evacuation. Service Animals, Emotional Support Animals or Psychiatric Service Animals may not occupy a seat.

(5) For travel to/from international destinations or to/from Puerto Rico or the U.S. Virgin Islands, certain additional health requirements may apply. Refer to Section 34 for restrictions relating to travel to and from international destinations.

(6) A trained Service Animal being delivered to its owner's domicile by a trainer will be permitted to travel at no charge.

(7) Animals in training will not be transported.

(8) Passenger assumes full responsibility for the conduct of his or her accompanying Service Animal, Emotional Support Animal or Psychiatric Service Animal. In the event Carrier incurs any loss, damage, delay, expense or legal liability of any kind in connection with the transport of such animal, Passenger accepts full liability for and shall reimburse Carrier for all such sums incurred.

(9) Carrier reserves the right to refuse transport of a Service Animal, Emotional Support Animal or Psychiatric Service Animal if the animal is too large to permit safe transport, exhibits aggressive behavior, demonstrates behavior that is inappropriate for a public setting or is otherwise determined by Carrier to pose a safety or security threat.

14

F.  Musical Instruments

    (1)  Small musical instruments (such as violins and guitars) of an appropriate size and weight are permitted for stowage in the overhead bin or under a Passenger seat on a first-come, first-served basis if there is space for such stowage at the time the Passenger boards, and will count as the Passenger's carry-on item.

    (2)  Large musical instruments (such as basses and cellos) of a size that prevents the instrument from being handled as normal carry-on baggage, and electronic equipment of a size that prevents it from being handled as normal carry-on baggage, will be accepted in the aircraft cabin subject to the following:

        (a)  the instrument or equipment must be contained in a case and the weight of the instrument, including the case or covering, cannot exceed one hundred and sixty five (165) pounds;

        (b)  the Passenger carrying the instrument or equipment in the aircraft cabin has purchased the additional seat(s) to accommodate the instrument or equipment; and

        (c)  the instrument or equipment can be stowed in accordance with FAA requirements for carriage of carry-on baggage or cargo.

G.  Carrier will refuse baggage articles or items that, for whatever reason, might create a risk of harm to the aircraft, its crew or its Passengers.

H.  If part of your itinerary involves travel on a Codeshare Partner, please see Section 35. If part of your itinerary involves travel on an interline partner, please see Section 36.

## 11.  <u>Checked Baggage General</u>

Subject to the restrictions set forth below, Carrier will check the baggage of a fare-paying Passenger for the flight on which the Passenger is traveling. Passenger may not check baggage for transportation on any flight other than the flight on which the Passenger is traveling. Carrier will not check baggage to a destination other than the final destination on the Passenger's reservation. Acceptance of baggage by Carrier is subject to the following terms and conditions:

A.  Each piece of baggage must have a current identification tag or label on the outside containing the Passenger's name, address and telephone number;

Rev. 01/16/2020

B.   Carrier will refuse to accept property as baggage which, because of its nature or characteristics, might cause damage to other baggage; and

C.   Carrier will not accept as baggage any article which cannot be carried in the baggage compartment of the aircraft.

Passengers may check baggage up to four (4) hours prior to their scheduled departure, provided that the Passengers remain in the airport facility. See Section 34 for additional restrictions that apply to international destinations.

If part of your itinerary involves travel on a Codeshare Partner, please see Section 35. If part of your itinerary involves travel on an interline partner, please see Section 36.

## 12.   **Baggage Allowance**

Carrier will allow Passengers with Blue Plus Fare, Blue Flex Fare, Blue Extra and Mint Confirmed Reservations the following included checked baggage allowance (see Section 34 for additional terms and restrictions that may apply to international travel):

A.   For purchases before November 12, 2019, for Blue Plus Fares one (1) piece of baggage, and for Blue Flex Fares and Mint two (2) pieces of baggage, of which the sum of the greatest outside length, plus the greatest outside width, plus the greatest outside height does not exceed sixty-two (62) inches for any individual piece or sporting equipment as described in Section 13B and weighing less than 51 pounds. In the case of oversize and overweight baggage or items, excess baggage charges described in Section 13 may apply, except for travel to and from international destinations which is governed by Section 34.

B.   For purchases on or after November 12, 2019, for Blue Plus Fares one (1) piece of baggage and for Mint two (2) pieces of baggage, of which the sum of the greatest outside length, plus the greatest outside width, plus the greatest outside height does not exceed sixty-two (62) inches for any individual piece or sporting equipment as described in Section 13B and weighing less than 51 pounds. In the case of oversize and overweight baggage or items, excess baggage charges described in Section 13 may apply, except for travel to and from international destinations which is governed by Section 34.

C.   One infant stroller and one infant car seat may be checked in addition to the included baggage allowance at no charge to any Passenger.

16

Rev. 01/16/2020

D.  Mobility and Assistive Devices which cannot be carried in the cabin due to space limitations will be checked and carried in addition to the included baggage allowance, without charge, provided the Passenger is dependent upon such items.

E.  One musical instrument packed in a hard-sided container may be transported as the Passenger's checked baggage in accordance with the included baggage allowance if meeting the size and weight restrictions contained in Section 12A. In the case of large or additional musical instruments, excess baggage charges described in Section 13 may apply.

F.  If part of your itinerary involves travel on a Codeshare Partner, please see Section 35. If part of your itinerary involves travel on an interline partner, please see Section 36.

## 13.  Excess Baggage Charges

A.  The following excess baggage fees apply (see Section 34 for additional terms and restrictions that may apply to international travel):

(1)  For Blue Basic Fares, Blue Fares, and Blue Extra Fares, one (1) piece of baggage that meets the weight and size limitations set forth in Section 12 is subject to a charge of Thirty Five Dollars ($35).

(2)  For all Fares except Mint, a second piece of checked baggage that meets the weight and size limitations set forth in Section 12 is subject to a charge of Forty Five Dollars ($45).

(3)  For all Fares, including Mint, baggage in excess of two pieces that meets the weight and size limitations set forth in Section 12 is subject to a charge of One Hundred and Fifty Dollars ($150) per piece, except as further limited to certain international destinations as described in Section 34.

(4)  Baggage in excess of sixty-two (62) inches but less than eighty (80) inches (sum of outside length plus outside height plus outside width) is subject to an oversize charge of One Hundred and Fifty Dollars ($150) per piece, with the exception of a standard hard-sided golf bag of up to eighty (80) inches which will not be subject to oversize fees.  Baggage in excess of eighty (80) inches will not be accepted as checked baggage.

(5)  Baggage weighing between fifty-one (51) pounds and ninety-nine (99) pounds is subject to an excess weight charge of One Hundred

Rev. 01/16/2020

and Fifty Dollars ($150) per piece. Baggage weighing one hundred (100) pounds or more will not be accepted as checked baggage.

(6) An item of baggage that exceeds the included baggage allowance described in Section 12, is oversized, and/or overweight will be subject to a combined fee.

(7) Notwithstanding the foregoing restrictions, military Passengers may check one duffel bag, B-4 bag, or sea bag which exceeds the sixty-two (62) inches in dimensions in lieu of one (1) included bag. In addition, hanging garment bags with outside dimensions up to ninety (90) inches will be accepted as part of the included baggage allowance if the bags are flexible.

B. Passengers may check the following items of sporting equipment properly packed in an appropriate hard-sided container, with each listed category counting as one bag for purposes of the included baggage allowance explained in Section 12:

(1) one (1) golf bag containing not more than fourteen (14) golf clubs, three (3) golf balls and one (1) pair of golf shoes;

(2) fishing equipment containing not more than two (2) fishing rods, one (1) reel, one (1) landing net, one (1) pair of fishing boots and one (1) fishing tackle box;

(3) one pair of snow skis or one snowboard packed in a suitable container, with one (1) pair of ski boots;

(4) one (1) pair of water skis, one (1) tow rope and one (1) life preserver belt or vest, packed in a suitable container;

(5) one (1) sporting gun case holding no more than two (2) rifles, two (2) shotguns, or four (4) pistols, each unloaded, subject to restrictions on firearms set forth in Section 14 and Section 34 for travel to and from international destinations;

(6) one (1) bowling ball bag, designed for this purpose, one (1) bowling ball, and one (1) pair of bowling shoes; or

(7) two (2) hockey or lacrosse sticks, taped together.

Sporting equipment items checked in excess of the one (1) bag allowance will be subject to standard excess baggage charges. Refer to Section 34 for restrictions relating to travel to and from international destinations.

18

C.   The following items are excluded from the baggage weight and size limitations set forth above, except that items weighing one hundred (100) pounds or more, unless otherwise noted, will not be accepted as checked baggage. These items shall be acceptable for carriage upon a Passenger's compliance with all special packing requirements and payment of applicable fees:

   (1)   single seat, non-motorized bicycles will be accepted as baggage if packaged in a hard-sided, padded bicycle case. Pedals and handlebars must be removed and stored so as to not create a risk of damage to other baggage;

   (2)   surfboards, with a single surfboard packed in each surfboard case and properly packed to prevent damage to the board and other baggage; or

   (3)   windsurfing and kitesurfing boards, when properly packed to prevent damage to the board, sail, boom, related equipment and to other baggage.

   (4)   Musical instruments, when packed in a hard-sided container, where the weight of the musical instrument (including the container) does not exceed one hundred and sixty-five (165) pounds and the sum of the greatest outside length, plus the greatest outside width, plus the greatest outside height of the container does not exceed one hundred and fifty (150) inches.

D.   Refer to Section 34 for additional terms and restrictions that may apply to travel to and from certain international destinations.

E.   If part of your itinerary involves travel on a Codeshare Partner, please see Section 35. If part of your itinerary involves travel on an interline partner, please see Section 36.

## 14.   Firearms

A.   Carrier will refuse to accept for transportation any firearms and ammunition other than sporting firearms that are not loaded and that are suitably encased. Rifles and shotguns must be packed in either a lockable crush-proof container specifically designed for the firearm, or in its own lockable hard sided case. Handguns must be packed inside a lockable hard sided gun case or in its own lockable hard sided case. Carrier will not accept for transportation any firearms in cases or luggage that cannot be locked.

19

B. All firearms require a Firearms Unloaded Declaration Tag to be read and signed by the Passenger. The Passenger is solely responsible for clearing the weapon of any live charges.

C. Passengers may check up to eleven (11) pounds of ammunition as checked baggage only. Ammunition must be housed separately from a locked firearm. The ammunition must be packaged in the manufacturer's original container or other fiber, wood or metal box that provides for adequate cartridge separation and is specifically designed to carry ammunition. Under no circumstances may a Passenger carry ammunition on board an aircraft.

D. Passengers under the age of eighteen (18) will not be allowed to check any type of firearm as checked baggage.

E. When checking a weapon, Passengers must declare to a representative of Carrier that a weapon is being checked. If a security checkpoint is located prior to the check-in counter of Carrier, the Passenger must declare the existence of a weapon to security personnel.

F. Firearms are not permitted to be carried or checked as baggage for travel to or from international destinations without prior government approval and supporting documents as governed by Section 34. If appropriate prior government approval and supporting documents are received, Sections 14A through 14F shall apply to carriage of firearms and ammunition to all international destinations.

G. If part of your itinerary involves travel on a Codeshare Partner, please see Section 35. If part of your itinerary involves travel on an interline partner, please see Section 36.

## 15.   Dangerous Goods

Federal law prohibits hazardous materials from being included in either checked or carry-on baggage. Items such as explosives, compressed gases, oxidizers, corrosives, flammable liquids and solids, loaded firearms, radioactive materials and poisons are considered hazardous. Some common examples of prohibited items include paints, mace/tear gas, lighter fluid, oxygen bottles and fireworks. Other common items that may be carried, in limited quantities, within baggage include hairspray, perfume, and certain medicines that the Passenger must use during flight. Dry ice will be accepted within carry-on or checked baggage if the dry ice is contained in a package that (a) allows the release of carbon dioxide, (b) is plainly marked with the words "dry ice" or "carbon dioxide solid" together with the net weight of the dry ice and the name of the contents being cooled, and (c)

Rev. 01/16/2020

the package contains less than five and a half (5.5) pounds of dry ice. Self-heating meals will be accepted within carry-on or checked baggage; however activation and use of self-heating meals will be prohibited onboard the aircraft.

## 16.   **Wheelchairs and Wheelchair Batteries**

Carrier will accept wheelchairs, whether manually operated or battery operated, as checked baggage on the same flight as the Passenger who uses the device, unless the Passenger requests stowage of his or her manual wheelchair within the cabin (subject to the specific aircraft configuration or other applicable limitations).

In addition to manual wheelchairs, Carrier will accept for in-cabin stowage other mobility aids such as crutches, braces, canes, and walkers, provided approved stowage is available and complies with federal regulations. Other Assistive Devices, including prescription medicine, syringes, or auto-injectors to administer medicine and other medical equipment discussed in Section 17 may be stowed and used within the cabin.

If a manual wheelchair, mobility device or other Assistive Device cannot be stowed in-cabin, Carrier will transport them in the baggage compartment.

Carrier will accept additional wheelchair batteries and battery-powered wheelchairs with the battery attached if the battery is labeled by the manufacturer as non-spillable. Batteries lacking non-spillable manufacturer labeling and spillable batteries that cannot remain in an upright position must be placed in special shipping boxes. Due to the advance notice requirement that may apply to obtaining these boxes, Passengers should advise Carrier at least forty-eight (48) hours before scheduled departure of the need for an appropriate battery box. Carrier will accept lithium batteries for in-cabin stowage with terminals taped or enclosed in a case. For stowage in the baggage compartment, only lithium batteries whose terminals are completely enclosed in a case are permitted, all others must be removed from the device and stowed in the cabin. Damaged or leaking batteries will not be transported.

Carrier will accept from Passengers written directions on disassembly and reassembly of wheelchairs, other mobility aids, and Assistive Devices. As described in Section 12C and Section 18, respectively, excess baggage charges and limits on liability for loss or damage to any items described in this paragraph do not apply.

If part of your itinerary involves travel on a Codeshare Partner, please see Section 35. If part of your itinerary involves travel on an interline partner, please see Section 36.

Rev. 01/16/2020

**17.** **Medical Equipment and Supplies**

Carrier will allow a Qualified Individual with a Disability to use in the passenger cabin a personal ventilator, respirator, continuous positive airway pressure machine (CPAP), bilevel positive airway pressure machine (BiPap) or an FAA-approved portable oxygen concentrator (POC). These medical devices must meet FAA requirements, display a manufacturer's label that it meets such requirements, and can only be stowed and used consistent with FAA, TSA and PHMSA regulations. Passengers must bring an adequate supply of non-spillable batteries, plainly marked as such, to last for 150% of the expected travel time. Carrier may deny boarding if a Passenger does not comply with the foregoing requirements.

**18.** **Baggage - Limitation of Liability**

Carrier will accept as checked baggage such personal property as is necessary or appropriate for the wear, use, comfort, or convenience of the Passenger for the purpose of the trip, subject to the following conditions:

    A.  International Transportation: Please see Section 23.

    B.  Domestic Transportation: Carrier's liability for loss of, damage to or delay in the delivery of checked or unchecked baggage or its contents is limited to proven damage or loss. Under no circumstances will Carrier's liability exceed Three Thousand Five Hundred Dollars ($3,500), unless Passenger is traveling with wheelchairs, mobility aids and/or Assistive Devices or Passenger has purchased excess coverage. Qualified Individuals with a Disability traveling with wheelchairs or Assistive Devices, or mobility aids will have no limit on liability for repair or replacement of such wheelchairs, Assistive Devices, or mobility aids. To obtain excess coverage, Passenger must declare excess valuation at the time of check-in and pay an additional charge of One Dollar ($1) for each One Hundred Dollars ($100) or fraction thereof, of excess valuation. Maximum liability is not to exceed Five Thousand Dollars ($5,000), including the Three Thousand Five Hundred Dollar ($3,500) standard liability per Passenger. Excess coverage is not available on items described in Sections 18F, 19 or 20. Passengers must make a reasonable effort to minimize the amount of damage or loss.  Actual value for reimbursement of lost or damaged property shall be determined by the documented original purchase price less any applicable depreciation for prior usage or damage.

Rev. 01/16/2020

C.  Carrier will be liable for personal property only for the period in which it is in the custody of Carrier. Carrier will assume no liability or responsibility for property carried onboard an aircraft by a Passenger and retained in the custody of the Passenger.

D.  Carrier's liability for loss, delay or damage to baggage is limited, unless a higher value is declared in advance and additional charges are paid. When excess value is declared, baggage will be checked and excess valuation charges collected only to point of Stopover or to destination.

E.  Baggage checked at the Gate or on board the aircraft will be subject to the same restrictions and liability limits as baggage checked at the ticket counter.

F.  Carrier will not accept for carriage medicines, money, checks, securities, jewelry (including watches), wigs, cameras, video, audio and other electronic equipment (including computers, software or music devices), CDs, DVDs, automotive parts, boat parts, silverware, optical equipment (including contact lenses), dental and orthodontic devices or equipment, keys, negotiable papers, securities, business documents, samples, items intended for sale, paintings, antiques, artifacts, manuscripts, animal antlers, furs, irreplaceable books, writing instruments, heirlooms, collector's items or publications and similar valuables contained in checked or unchecked baggage. Excess valuation may not be declared on any such items. Passengers are encouraged to carry such valuable items personally. In the case of domestic transportation, Carrier reserves the right to require the Passenger to sign a limited liability release before accepting any such items for transportation. In the case of domestic transportation, if any valuable items of the type described in this paragraph are lost, damaged or delayed, Passenger will not be entitled to any reimbursement or compensation from Carrier, whether or not a limited liability release has been signed by Passenger.

G.  Carrier shall not be liable for loss or damage to items including but not limited to baggage wheels, pockets, pull handles, handles, zippers, hanger hooks, external locks, pull straps or security straps resulting from fair wear and tear or the ordinary handling of baggage.  Further, Carrier shall not be liable for loss, damage or delay caused by manufacturer's defect, by overpacked baggage, or as a result of the inherent defect or quality of the baggage.

H.  Under no circumstances shall Carrier be liable to any Passenger for any type of special, incidental or consequential damages related to the damage, loss or delay of checked baggage.

23

Rev. 01/16/2020

l.    If part of your itinerary involves travel on a Codeshare Partner, please
see Section 35. If part of your itinerary involves travel on an interline
partner, please see Section 36.

## 19.    Fragile and Perishable Items as Baggage

Carrier, in its discretion, may refuse to accept any fragile or perishable goods.

For domestic transportation, Carrier assumes no liability for fragile or perishable
goods. Excess valuation may not be declared on such items. If Carrier does
accept such goods for transportation, in the case of domestic transportation, it
reserves the right to require the Passenger to sign a limited release with respect
to such goods. In the case of domestic transportation, Carrier shall not be
responsible for loss, damage or delay of such fragile items whether or not such a
limited release has been signed by the Passenger.

Fragile items include, without limitation, items such as bicycles, blueprints,
cameras, ceramics, china, crystal, dolls, figurines, flash equipment, flowers, glass
or glass containers, lenses, maps, mirrors, models, musical instruments or
equipment, paintings, perfumes, makeup, liquids, bottles, plants, sculptures,
strollers, trophies, vases and wines.

Perishable items include, without limitation, items such as fruits, vegetables,
meats, fish, poultry, bakery products and other forms of food, flowers and floral
displays and plants. Such items may also be subject to applicable agriculture
rules of the destination jurisdiction. Dry ice shipments are limited by dangerous
goods regulations and are discussed separately in Section 15.

## 20.    Improperly Packaged and Damaged Items; Late Items

Carrier reserves the right to refuse to transport items that are improperly
packaged or that are damaged at the time the item is checked, or that are
presented to be checked as baggage less than forty (40) minutes before
scheduled domestic flight departure and sixty (60) minutes before scheduled
international flight departure.  Refer to Section 34 for restrictions relating to travel
to and from international destinations. If such items are accepted, Carrier is not
liable for any loss or damage resulting from the inherent defect or quality of the
item.  As a condition of accepting such items, Carrier may require the Passenger
to sign a limited liability release form.  Carrier shall not be responsible for loss,
damage or delay of such items whether or not such a limited release has been
signed by the Passenger.

Rev. 01/16/2020

**21.** **Smoking**

Smoking aboard the aircraft is prohibited in accordance with federal law.

**22.** **Notice of Claims**

A. For domestic transportation, initial notice of any claim for loss, damage, or delay in delivery of baggage must be given at any Passenger service counter or any office of Carrier within four (4) hours after arrival of the flight on which the loss, damage or delay is alleged to have occurred. Confirming written notice of any baggage related claim, and initial written notice of any other type of claim against Carrier, with appropriate details of the claim, must be given to Carrier not more than twenty-one (21) days after occurrence of the event giving rise to the claim. Failure to give notice within these time limits will not bar the claim if the claimant establishes to the satisfaction of Carrier that he/she was unable to give such notice.

For domestic transportation, legal action on any claim described above must be brought within one (1) year of Carrier's written denial, in whole or in part, of the claim.

B. For international transportation, please see Section 23.

C. With respect to any claim for compensation of any nature, Passenger must submit their claim directly to Carrier and allow 28 days, or any shorter time as prescribed by local law, for Carrier to respond. Carrier will not accept or process any claims submitted by a third party on behalf of any Passenger unless this period has elapsed without a response to Passenger. Notwithstanding this limitation, Carrier will permit a Passenger to make a claim on behalf of other Passengers on the same reservation, Passengers lacking capacity to submit their own claims, and claims on behalf of minor Passengers. Carrier may require and evaluate proof that any party other than Passenger is authorized to submit a claim on their behalf. Passenger may consult with legal or other third party advisors before submitting a claim directly. Claims may be submitted online at http://www.jetblue.com/help/contactus/.

**23.** **Advice to International Passengers on Carrier Liability**

A. Application of Montreal or Warsaw Convention:  For the purposes of international carriage governed by the Montreal Convention or the Warsaw Convention, whichever may apply, the liability rules set out in the applicable Convention as implemented by this Section are fully

25

incorporated by reference in this Contract of Carriage and shall supersede any other provisions of this contract which may be inconsistent with those rules.

B. Death or Injury of Passengers:

(1) The Carrier shall be liable under Article 17 of the Montreal Convention or Warsaw Convention, whichever may apply, for recoverable compensatory damages sustained in the case of death or bodily injury of a Passenger, as provided in the following paragraphs:

(a) The Carrier shall not be able to exclude or limit its liability for damages not exceeding 128,821 Special Drawing Rights for each Passenger.

(b) The Carrier shall not be liable for damages to the extent that they exceed 128,821 Special Drawing Rights for each Passenger if the Carrier proves that: (i) such damage was not due to the negligence or other wrongful act or omission of the Carrier or its servants or agents; or (ii) such damage was solely due to the negligence or other wrongful act or omission of a third party.

(c) The Carrier reserves all other defenses and limitations available under the Montreal Convention or Warsaw Convention, whichever may apply, to such claims including, but not limited to, the exoneration defense of Article 20 of the Montreal Convention and Article 21 of the Warsaw Convention, except that the Carrier shall not invoke Articles 20 and 22(1) of the Warsaw Convention in a manner inconsistent with paragraphs (a) and (b) hereof.

(d) With respect to third parties, the Carrier reserves all rights of recourse against any other person, including, without limitation, rights of contribution and indemnity.

(e) The Carrier agrees that, subject to applicable law, recoverable compensatory damages for such claims may be determined by reference to the laws of the country of the domicile or country of permanent residence of the Passenger.

(2) In cases of bodily injury or death, the Carrier shall make an advance payment where the Carrier determines it is necessary to meet the immediate economic needs of, and hardship suffered by, a Passenger as provided in the following paragraphs:

Rev. 01/16/2020

(a) Unless a dispute arises over the identity of the person to whom an advance payment shall be made, the Carrier shall, without delay, make the advance payment to the Passenger in an amount or amounts determined by the Carrier in its sole discretion. In the event of death of a Passenger, the amount of the advance payment shall not be less than 16,000 Special Drawing Rights, which shall be paid to a representative of the Passenger's next of kin eligible to receive such advance payment as determined by the Carrier in its sole discretion.

(b) The Carrier shall make the advance payment as an advance against the Carrier's liability under the Montreal Convention or the Warsaw Convention, whichever may apply. An advance payment shall not constitute recognition of liability. An advance payment shall be offset against, or deducted from the payment of, any settlement or judgment with respect to any claim for compensation on behalf of the Passenger.

(c) The Carrier, in making an advance payment, does not waive any rights, defenses, or limitations available under the Montreal Convention or the Warsaw Convention, whichever may apply, to any claim, nor shall acceptance of an advance payment constitute a release of any claim, whatsoever, by any person.

(d) The Carrier, in making an advance payment, preserves its right to seek contribution or indemnity from any other person for such payment, which shall not be deemed to be a voluntary contribution or contractual payment on the part of the Carrier.

(e) The Carrier may recover an advance payment from any person where it is proven that the Carrier is not liable for any damage sustained by the Passenger, or where it is proven that the person was not entitled to receive the payment, or where and to the extent that it is proven that the person who received the advance payment caused, or contributed to, the damage.

C. Delay of Passengers: The Carrier shall be liable for damage occasioned by delay in the carriage of Passengers by air, as provided in the following paragraphs:

(1) The Carrier shall not be liable if it proves that it and its servants and agents took all measures that could reasonably be required to avoid the damage, or that it was impossible for it or them to take such measures.

Rev. 01/16/2020

(2) Airport, Air Traffic Control, security, and other facilities or personnel, whether public or private, not under the control and direction of the Carrier are not servants or agents of the Carrier, and the Carrier is not liable to the extent the delay is caused by these kinds of facilities or personnel.

(3) Damages occasioned by delay are subject to the terms, limitations and defenses set forth in the Montreal Convention and the Warsaw Convention, whichever may apply. They include foreseeable compensatory damages sustained by a Passenger and do not include mental injury damages.

(4) The Carrier reserves all defenses and limitations available under the Montreal Convention or the Warsaw Convention, whichever may apply to claims for damage occasioned by delay, including, but not limited to, the exoneration defense of Article 20 of the Montreal Convention and Article 21 of the Warsaw Convention. Under the Montreal Convention, the liability of the Carrier for damage caused by delay is limited to 5,346 Special Drawing Rights per Passenger. The limits of liability shall not apply in cases described in Article 22(5) of the Montreal Convention or Article 25 of the Warsaw Convention, whichever may apply.

D. Destruction, Loss, or Delay of Baggage: The Carrier is liable for damages sustained in the case of destruction or loss of, damage to, or delay of checked and unchecked Baggage, as provided in the following paragraphs:

(1) Except as provided below, the liability of the Carrier is limited to 1,288 Special Drawing Right for each passenger in the case of destruction, loss, damage, or delay of Baggage, whether checked or unchecked, under the Montreal Convention or the Warsaw Convention, whichever may apply. Unless the Passenger proves otherwise:

(a) All Baggage checked by a Passenger shall be considered to be the property of that Passenger;

(b) A particular piece of Baggage, checked or unchecked, shall not be considered to be the property of more than one Passenger;

(c) Unchecked Baggage, including personal items, shall be considered to be the property of the Passenger in possession of the Baggage at the time of embarkation.

28

Rev. 01/16/2020

(2) If a Passenger makes, at the time checked Baggage is handed to the Carrier, a special declaration of interest and has paid a supplementary sum, if applicable, the Carrier will be liable for destruction, loss, damage, or delay of such checked Baggage in an amount not exceeding the declared amount, unless the Carrier proves that the declared amount is greater than the Passenger's actual interest in delivery at destination. The declared amount, and the Carrier's liability, shall not exceed the total amount of declaration permissible under the Carrier's regulations, inclusive of the limitation of paragraph D(1) hereof. In the case of transportation under the Warsaw Convention, no supplementary sum shall apply unless the declared amount exceeds 19 Special Drawing Rights per kilogram of the total recorded weight of the checked Baggage at the time the Baggage is handed to the Carrier. Nevertheless, the Carrier may impose charges for pieces of Baggage in excess of any free allowance the Carrier may provide.

(3) In the case of unchecked Baggage, the Carrier is liable only to the extent the damage resulted from its fault, or that of its servants or agents.

(4) The Carrier is not liable for destruction, loss, damage, or delay of baggage not in the charge of the Carrier, including Baggage undergoing security inspections or measures not under the control and direction of the carrier.

(5) The Carrier reserves all defenses and limitations available under the Montreal Convention and the Warsaw Convention, whichever may apply, to such claims including, but not limited to, the defense of Article 20 of the Warsaw Convention and Article 19 of the Montreal Convention, and the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention, except that the Carrier shall not invoke Article 22(2) and (3) of the Warsaw Convention in a manner inconsistent with paragraph D(1) hereof. The limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22(5) of the Montreal Convention, whichever may apply.

E.  Time Limitations on Claims and Actions: Under the Montreal Convention and the Warsaw Convention, whichever may apply, an action for damages must be brought within two years, and a complaint must be made to the Carrier no later than seven (7) calendar days in the case of damage to baggage, and twenty one (21) calendar days in the case of delay thereof.

Rev. 01/16/2020

F.   ADVICE TO INTERNATIONAL PASSENGERS ON CARRIER LIABILITY:

(1) Passengers on a journey involving an ultimate destination or a stop in a country other than the country of departure are advised that international treaties known as the Montreal Convention, or its predecessor, the Warsaw Convention, including its amendments, may apply to the entire journey, including any portion thereof within a country. For such passengers, the treaty, including special contracts of carriage embodied in applicable tariffs, governs and may limit the liability of the Carrier in respect of death or injury to passengers, and for destruction or loss of, or damage to, baggage, and for delay of passengers and baggage.

(2) Limits of Liability in connection with services provided in the European Union (EU): The applicable limits of liability for your journey on a flight ticketed by this carrier are:

(a) There are no financial limits for death or bodily injury and the air carrier may make an advance payment to meet immediate economic needs of the person entitled to claim compensation;

(b) In the case of destruction, loss of, or damage or delay to baggage, 1,288 Special Drawing Rights per passenger in most cases. You may benefit from a higher limit of liability for loss of, damage or delay to baggage by making at check-in a special declaration of the value of your baggage and paying any supplementary fee that may apply. Alternatively, if the value of your baggage exceeds the applicable limit of liability, you should fully insure it before you travel;

(c) In the case of delay to your journey, 5,346 Special Drawing Rights per passenger.

If your journey involves carriage by other carriers please contact them for information on their limits of liability.

Rev. 01/16/2020

**24.**   **Refusal to Transport**

The following Passengers will be refused transportation on Carrier:

A.   Passengers whose transportation on Carrier must be denied in order to comply with any government regulation, or to comply with any governmental request for emergency transportation in connection with the national defense.

B.   Passengers whose transportation on Carrier is reasonably deemed by Carrier to be inadvisable or inappropriate due to special circumstances or concerns beyond the control of Carrier, including, without limitation, a Force Majeure Event.

C.   Passengers who refuse to permit a search of his or her person or property for explosives or for concealed, deadly or dangerous weapons or other prohibited articles, or who refuse on request to produce positive identification.

D.   Passengers requiring medical oxygen for use on board the aircraft, incubators or hook-ups for a respirator to the aircraft electrical power supply, or persons who must travel on a stretcher. However, JetBlue will not deny boarding to a Qualified Individual with a Disability who travels with a Portable Oxygen Concentrator (POC) unless such individual must use the POC during the flight with a hook-up to the aircraft electrical power supply.

E.   A Qualified Individual with a Disability pursuant to 14 CFR Part 382 whose carriage may impair the safety of the flight or violate Federal Aviation Regulations. Carrier may require that a Qualified Individual with a Disability be accompanied by an assistant as a condition of being provided air transportation under the following circumstances:

(1)   A person who, because of a mental disability, is unable to comprehend or respond accordingly to safety instructions from Carrier personnel, including the safety briefing required by 14 CFR Parts 121.571(a)(3) and (a)(4); or the safety regulations of a foreign carrier's government, as applicable;

(2)   A person with a mobility impairment so severe that the person is unable to physically assist in his or her own evacuation of the aircraft;

Rev. 01/16/2020

(3) A person who has both severe hearing and severe vision impairments, if the person cannot establish some means of communication with Carrier personnel that is adequate to both permit transmission of the safety briefing required by 14 CFR Part 121.571(a)(3) or (a)(4) or the safety regulations of a foreign carrier's government, as applicable, and to enable the Passenger to assist in his or her own evacuation of the aircraft in the event of an emergency;

(4) If Carrier determines that a person meeting the criteria of paragraph E(1), (2) or (3) of this Section must travel with an assistant, contrary to the individual's self-assessment that he or she is capable of traveling independently, Carrier will not charge for the transportation of the assistant while accompanying a Qualified Individual with a Disability requiring an assistant at Carrier's discretion:

   (a) If, because there is not a seat available on a flight for an assistant whom Carrier has determined to be necessary, a Qualified Individual with a Disability with a Confirmed Reservation is unable to travel on the flight, the Qualified Individual with a Disability will be eligible for denied boarding compensation under Section 27;

   (b) For purposes of determining whether a seat is available for an assistant, the assistant shall be deemed to have checked in at the same time as the Qualified Individual with a Disability; and

   (c) Carrier is not required to find or provide a safety assistant.

F.  Comfort and Safety: In the following categories where refusal or removal may be necessary for the comfort or safety of the Passenger(s) or other Passengers:

   (1) Persons whose conduct is or has been known to be disorderly, abusive, offensive, threatening, intimidating violent, or whose clothing is lewd, obscene, or patently offensive;

   (2) Persons who are barefoot and over five (5) years old;

   (3) Persons who are unable to sit in the seat in the full upright position with the seat belt fastened;

   (4) Persons who appear to be intoxicated or under the influence of drugs;

32

(5)   Persons with a communicable disease or infection whose condition poses a direct threat to the health or safety of others. However, Carrier will permit a Passenger who meets the foregoing criteria to travel if he/she provides a medical certificate to Carrier dated within ten (10) days of the scheduled date of travel from the Passenger's physician stating that the Passenger is capable of completing the flight safely without requiring extraordinary medical assistance;

(6)   Persons who refuse to comply with instructions given by Carrier station management, supervisory personnel, or uniformed flight crew;

(7)   Persons who have an offensive odor, except where such condition is the result of a qualified disability;

(8)   Persons who wear or have on or about their persons concealed or unconcealed deadly or dangerous weapons; provided, however, that Carrier will carry Passengers who meet the qualifications and conditions established in 14 CFR Part 108.11;

(9)   Manacled persons in the custody of law enforcement personnel; persons brought to the airport in manacles; persons who have resisted escorts; or escorted persons who express to Carrier personnel objection to the flight;

(10) Persons who have misrepresented a condition which becomes evident upon arrival at the airport, and the condition is unacceptable for passage;

(11) Pregnant Passengers expecting to deliver within seven (7) days, unless such Passenger provides a doctor's certificate dated no more than seventy-two (72) hours prior to departure stating that the doctor has examined and found the Passenger to be physically fit for air travel to and from the destination requested on the date of the flight and that the estimated date of delivery is after the date of the last flight in the Passenger's itinerary. In the case of codeshare travel, codeshare partner may have more restrictive terms. In the case of Interline Transportation, the interline partner may have more restrictive terms;

(12) Passengers between the age of three (3) and fourteen (14) days, unless attending physician approves travel;

(13) Passengers who are unwilling or unable to abide by Carrier's no-smoking rules; and

Rev. 01/16/2020

(14)Carrier will not refuse to provide transportation to a Qualified Individual with a Disability solely because the person's disability results in appearance or involuntary behavior that may offend, annoy or inconvenience crewmembers or other Passengers. Carrier will not provide certain extensive inflight special services including, but not limited to, assistance in actual eating, assistance within the restroom or assistance at the Passenger's seat with elimination functions, or provision of medical services. In the case of codeshare travel, codeshare partner may have more restrictive terms In the case of Interline Transportation, the interline partner may have more restrictive terms.

(15)Any Passenger who cannot be transported safely for any reason.

G.  The tickets of any Passenger refused passage or removed enroute under the provisions of this Section 24 will be refunded in accordance with Section 26.  Such a refund shall be the sole recourse of any Passenger refused passage or removed enroute. UNDER NO CIRCUMSTANCES WILL CARRIER BE LIABLE TO ANY PASSENGER OR REFUSED PASSENGER FOR ANY TYPE OF INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES.

## 25.   Failure to Operate as Scheduled

A.  Whenever Carrier cancels or otherwise fails to operate any scheduled flight, Carrier will, at the request of the Passenger, either (i) transport the Passenger on another of Carrier's flights on which space is available in the same class of service at no additional charge, or (ii) provide Passenger with a full refund in accordance with Section 26. Except as may be provided in Section 37, Carrier shall have no other liability or responsibility to any Passenger as a result of a failure to operate any flight.  UNDER NO CIRCUMSTANCES SHALL CARRIER BE LIABLE TO ANY PASSENGER FOR ANY TYPE OF SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES.

B.  Carrier will endeavor to carry Passengers and their baggage with reasonable dispatch, but times shown in schedules or elsewhere are not guaranteed and form no part of this Contract of Carriage. Carrier may, without notice, substitute alternate carriers or aircraft and, if necessary, may alter or omit intermediate stops shown on the reservation. All schedules are subject to change without notice. Carrier is not responsible and assumes no liability for failure to make connections on its own flights or the flights of any other airline. UNDER NO CIRCUMSTANCES SHALL CARRIER BE LIABLE TO ANY PASSENGER FOR ANY TYPE OF SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES.

34

26.  **Relief for Failure to Transport / Failure to Operate**

If Carrier cancels a flight or fails to operate a flight as scheduled, the Passenger may be entitled to relief under the provisions of Section 37. If Carrier denies boarding to a Passenger with a valid reservation, the Passenger will be entitled, at his or her option, to either (i) transportation at no extra charge on another of Carrier's flights to the same destination, subject to space availability, or (ii) a refund of the applicable fare paid by Passenger. When a portion of the trip has been made, the refund will be made in an amount equal to the applicable one-way fare (less any applicable discount) for the portion of the trip cancelled or not operated as scheduled by Carrier.

27.  **Denied Boarding Compensation**

   A.  If a Passenger holding a Confirmed Reservation presents him or herself for carriage at the appropriate time and place, having complied fully with Carrier's requirements as to reservations and check-in, and if the flight for which the Passenger holds a Confirmed Reservation is oversold and due to oversales, JetBlue is unable to accommodate the Passenger and departs without him or her, the Passenger shall be entitled to the denied boarding compensation described in Section 27B immediately below unless (i) the Passenger responds to Carrier's request for volunteers and who willingly accepts Carriers' offer of compensation, in any amount; or (ii) one of the exceptions to eligibility for denied boarding compensation in Section 27D below applies. For the sake of clarity, a Passenger who responds to Carrier's request for volunteers and who willingly accepts Carrier's offer of compensation shall not be considered to be involuntarily denied boarding and shall not be entitled to denied boarding compensation.

   B.  A Passenger who is denied boarding involuntarily, subject to the exceptions in Section 27D below, shall be entitled to One Thousand Three Hundred and Fifty Dollars ($1,350).

   C.  Acceptance of denied boarding compensation relieves Carrier from any further liability caused by its failure to honor the Passenger's original Confirmed Reservation.

   D.  Passengers denied boarding involuntarily are not entitled to denied boarding compensation if:

Rev. 01/16/2020

(1)   The Passenger does not fully comply with this Contract of Carriage regarding ticketing, reconfirmation, check-in, acceptability for transportation;

(2)   The flight for which the Passenger holds a Confirmed Reservation is unable to accommodate that Passenger because of substitution of equipment of lesser capacity when required by operational or safety reasons;

(3)   The Passenger is offered accommodations or is seated in a section of the aircraft other than that specified on the ticket at no extra charge, except that a Passenger seated in a section for which a lower fare is charged shall be entitled to an appropriate refund;

(4)   Carrier arranges alternate transportation, or other transportation used by the Passenger at no extra cost to the Passenger, that at the time such arrangements are made is planned to arrive at the airport of the Passenger's next Stopover or, if none, at the airport of the final destination not later than one (1) hour after the planned arrival time of the Passenger's original flight; or

(5)   The Passenger voluntarily relinquishes his or her Confirmed Reservation in exchange for compensation offered by Carrier.

E.   In determining which Passengers holding Confirmed Reservations shall be denied boarding involuntarily, Carrier shall deny boarding to such Passengers in the order of when Passengers checked in, commencing with those Passengers who checked in last.

F.   Before denied boarding occurs, Carrier will give a written explanatory statement to Passengers who are denied boarding.

## 28.   **Reservations on Other Carriers**

Carrier will only accept reservations made on, or tickets issued by, other carriers, in accordance with federal law when a carrier has ceased operations following bankruptcy.

Rev. 01/16/2020

29.   **Right to Change Contract of Carriage**

Carrier reserves the right, to the extent not prohibited by federal law, to change, delete, or add to any of the terms of this Contract of Carriage without prior notice. All changes must be in writing and must be available for public inspection at each of Carrier's ticket offices. To the extent there is a conflict between the Contract of Carriage and your itinerary, ServiceNow, or other publications, the Contract of Carriage governs. Previous versions of the Contract of Carriage may be obtained by contacting JetBlue at 1-800-JETBLUE (deaf or hard of hearing customers TTY/TDD line available by dialing 711) or by contacting us through http://www.jetblue.com/help/contactus/.

30.   **Ground Transportation**

Ground transportation is exclusively the responsibility of Passenger.

31.   **Check Acceptance**

Carrier will not accept checks as payment for purchase, except in the case of Group Reservations as defined in Section 5. For Group Reservations, personal checks made payable to Carrier for the exact amount of purchase must include imprinted name, mailing address and telephone number. A valid driver's license with picture (or valid passport) as personal identification is required. Carrier reserves the right to require that checks be approved by a third-party check approval system.

A service charge of Fifteen Dollars ($15) will be assessed to a Passenger on all returned checks. This service charge is in addition to any applicable bank charges assessed against Carrier or the Passenger.

32.   **Government Laws and Regulations**

All transportation is sold and all carriage is performed subject to compliance with all applicable government laws and regulations, including those of the Federal Aviation Administration and U.S. Department of Transportation, Transportation Security Administration, and all applicable Conventions, special contracts, treaties, and tariffs, many of which are not specified herein but are nevertheless binding on Carrier and all Passengers.

Immigration and Customs Regulations: It is the Passenger's responsibility to obtain and have possession of all required travel documents.  Carrier assumes no responsibility for compliance by Passengers with immigration and customs laws and regulations of each country from, through, or to which a flight is

Rev. 01/16/2020

operated.  Carrier shall not be responsible for any information or assistance given to a Passenger by any agent in connection with obtaining such necessary documents or complying with such laws and regulations, or any consequence to any Passenger resulting from his or her failure to obtain such documents and comply with such laws and regulations.

### 33.   U.S. Territory Travel

For all travel to and from U.S. territories, the following rules apply:

A.   Satellite TV and other inflight connectivity services, where available, may be inoperative on the transoceanic portions of the flight. Carrier is not liable, in contract or otherwise, to the Passenger for any such unavailability of satellite TV or other inflight connectivity.

B.   Passengers remain responsible for any and all documentation requirements and proof of citizenship. Carrier shall not be responsible for a Passenger's failure to present or provide documentation required under the applicable laws of the territories to or from which a Passenger travels or through which Passenger may transit.

### 34.   International Travel

For international travel on a Carrier-operated flight the following rules apply:

A.   Baggage:

(1)   For travel to and from the Dominican Republic or Haiti, Carrier will not accept more than two (2) pieces of checked baggage and will not accept oversized (over sixty-two (62) inches in overall dimensions) or overweight (over fifty (50) pounds) baggage. A first and second piece of checked baggage may be subject to excess baggage charges as set forth in Section 13.

(2)   For travel to and from Ecuador, Guyana, Peru or Trinidad and Tobago, Carrier will not accept more than two (2) pieces of checked baggage and will not accept oversized (over sixty-two (62) inches in overall dimensions) baggage or baggage weighing over seventy (70) pounds. A first and second piece of checked baggage or overweight baggage (between 51 and 70 pounds) may be subject to excess baggage charges as set forth in Section 13.

38

(3) For travel to and from Cuba, Carrier will not accept more than five (5) pieces of checked baggage. A first, second, third, fourth and fifth piece of checked baggage, oversized baggage (between sixty-two (62) and eighty (80) inches in overall dimensions), or overweight baggage (between 51 and 99 pounds) may be subject to excess baggage charges as set forth in Section 13. Checked baggage in excess of three (3) pieces will not be accepted during any Carrier baggage embargo period.

(4) For travel to and from all international destinations except the Dominican Republic, Ecuador, Guyana, Haiti, Peru or Trinidad and Tobago, Carrier will accept excess, overweight and/or oversized baggage on an aircraft weight (load factor) basis. If accepted by Carrier, excess, overweight and/or oversized baggage may be subject to excess baggage charges as set forth in Section 13.

(5) With respect to sporting equipment, for travel to and from the Dominican Republic, Haiti, Peru or Trinidad and Tobago, bicycles, hockey sticks, lacrosse sticks, skis, snowboards and water skis will not be accepted. For travel to and from Bermuda; Cuba; Santo Domingo, Dominican Republic; Santiago, Dominican Republic; Haiti, Peru or Trinidad and Tobago, surfboards, kitesurfing boards and windsurfing boards will not be accepted.

(6) No boxes will be permitted as checked baggage except for travel to and from Cuba, as set forth within this section. If such items are accepted, Carrier may require the Passenger to sign a limited liability release form. Carrier shall not be responsible for loss, damage or delay of such items whether or not such a limited release has been signed by the Passenger.

(7) For travel to and from Cuba, factory sealed boxes may be accepted subject to the excess baggage charges as set forth within this section and in Section 13. No boxes will be accepted during any Carrier baggage embargo period.

(8) Carrier reserves the right to refuse to transport items that are presented to be checked as baggage less than sixty (60) minutes before scheduled flight departure.

B.   Pets, Service Animals, Emotional Support Animals and Psychiatric Service Animals: Passengers are responsible for complying with any applicable laws and/or governmental regulations of the destination to and from which the animal is being transported, including furnishing valid health and rabies vaccination certificates, when required. Due to the strict requirements mandated by the local governments of

39

Barbados, the Cayman Islands, Jamaica, St. Lucia, and Trinidad and Tobago the transport of live animals and pets is not permitted by Carrier for travel to those countries.

C.  Firearms: Firearms are not permitted to be carried or checked as baggage without prior government approval and supporting documentation.

D.  Satellite TV and inflight connectivity services: On all flights to and from international destinations, satellite TV and other inflight connectivity services, where available, may be inoperative on the transoceanic portions of the flight. Carrier is not liable, in contract or otherwise, to the Passenger for any such unavailability of such services.

E.  Transit Without Visa: Carrier will not permit transit without visa.

F.  Documentation: Passengers are responsible for any and all documentation requirements and proof of citizenship. Carrier shall not be responsible for a Passenger's failure to present or provide documentation required under the applicable laws of the territories to or from which a Passenger travels or through which Passenger may transit.  Subject to applicable law and regulations, Passenger agrees to pay the applicable fare in the event Carrier, on government order, is required to return Passenger to their point of origin or elsewhere due to Passenger's inadmissibility into or deportation from a country, whether of transit or of destination. The fare applicable will be the fare in effect when the ticket is issued, and any difference between this fare and any unused fare paid by Passenger will be collected from or refunded to Passenger as applicable. The fare collected for carriage to the point of refusal or deportation will not be refunded by the Carrier, unless such refund is compelled by local law.

With respect to travel to Cuba, Passengers are responsible for determining their applicable license category and Carrier shall not be responsible for a Passenger's failure to comply with such licensing requirements.

G.  Conflict With Local Law: Except where otherwise mandated by applicable international law or treaty, should the enforcement of any provision of this Contract of Carriage conflict with the domestic law or regulation of a non-U.S. state, the invalidation or non-enforcement of that provision to comply with such local law does not otherwise invalidate the enforceability of any contractual terms not implicated thereby.

Rev. 01/16/2020

### 35.   <u>Codeshare Flights</u>

A.   Operated by Codeshare Partner: Carrier has entered into codeshare arrangements with certain Codeshare Partners enabling Carrier to provide air transportation services to Passengers on flights operated by Codeshare Partners. Transportation provided by Carrier under a codeshare arrangement is designated by a flight number that includes Carrier's two-letter airline designator code, "B6." However, the flight is operated by a Codeshare Partner.

Those Passengers purchasing tickets for a Carrier flight (any ticket for a flight with designator code "B6" in the flight number on Passenger's itinerary), are subject to the Contract of Carriage with Carrier, regardless of the airline operating the flight. Carrier accepts responsibility for the entirety of that journey under Carrier's designator code pursuant to this Contract of Carriage.

Each Codeshare Partner promulgates rules with respect to the operation of its own flights, and some may differ from Carrier's rules for flights operated by Carrier. For example, a Codeshare Partner may have rules governing check-in requirements, carriage of animals, baggage, baggage liability, carriage of musical instruments, smoking, unaccompanied minors and/or denied boarding compensation that differ from Carrier's rules for flights Carrier operates. Additionally, when a Codeshare Partner operates a flight on which Carrier's designator code "B6" appears on the Passenger's itinerary, the Codeshare Partner's contingency plan for lengthy tarmac delays applies. The conditions of carriage of Carrier's Codeshare Partners are available at the following links and are incorporated herein by reference. Passengers traveling on a flight operated by a Codeshare Partner should review the applicable conditions of carriage to ensure familiarity and compliance with all rules and terms.

Carrier does not allow unaccompanied minors on flights with intermediate stops or on connecting flights, therefore, if travel involves transfer to or from a Codeshare Partner, unaccompanied minors will not be allowed. However, an unaccompanied minor may be allowed to travel on a Codeshare Partner's non-stop itinerary. The Codeshare Partner's rules governing unaccompanied minors will apply and you may need to contact the Codeshare Partner directly.

(1) Cape Air:
https://www.capeair.com/flying_with_us/carriage_05.pdf

41

(2) Emirates:
http://www.emirates.com/english/plan_book/essential_informatio
n/rules_and_notices/rules_notices.aspx

(3) Hawaiian Airlines:
https://www.hawaiianairlines.com/legal/domestic-contract-of-
carriage

(4) Icelandair:
http://www.icelandair.us/information/about-icelandair/privacy-
terms/

(5) JetSuite:
https://www.jetsuitex.com/ContractofCarriage.pdf

(6) Seabourne:
http://www.seaborneairlines.com/fly-with-us/contract-of-carriage/

(7) Silver Airways:
http://www.silverairways.com/docs/site/legaldocs/contract-of-
carriage

(8) South African Airways:
http://www.flysaa.com/Journeys/conditions_of_Contract.action

B.   Operated by Carrier: Carrier also enters into certain codeshare
relationships where another airline places its code on certain Carrier-
operated flights.  If you have purchased a ticket on a flight operated by
Carrier but your ticket includes another airline's designator code in the
flight number, your condition of carriage is with that airline, not Carrier.
For example, the following airlines may place their code on certain
Carrier-operated flights, and the conditions of carriage applicable to
transportation on such flights are available at the following links.

(1) Aer Lingus:
http://www.aerlingus.com/i18n/en/htmlPopups/conds_of_carriage
.html

(2) Azul – Linhas Aereas Brasileiras:
http://www.voeazul.com.br/en/flights-international/contract-of-
carriage

(3) El Al:
http://www.elal.co.il/elal/english/terms_conditions/termsandcondit
ions070108.html

42

(4) Emirates:
http://www.emirates.com/english/plan_book/essential_informatio
n/rules_and_notices/rules_notices.aspx

(5) Etihad:
http://www.etihad.com/en/legal/conditions-of-carriage/

(6) Hawaiian Airlines:
https://www.hawaiianairlines.com/legal/domestic-contract-of-
carriage

(7) Icelandair:
http://www.icelandair.us/information/about-icelandair/privacy-
terms/

(8) Japan Airlines:
http://www.jal.co.jp/en/carriage/index_c001.html

(9) Qatar:
https://www.qatarairways.com/en-us/legal/conditions-of-
carriage.html

(10)Royal Air Maroc:
http://www.royalairmaroc.com/us-en/Travel-Info/General-terms-
and-conditions

(11)Singapore Airlines:
http://www.singaporeair.com/jsp/cms/en_UK/global_footer/condit
ions-carriage.jsp

(12)South African Airways:
http://www.flysaa.com/Journeys/conditions_of_Contract.action

(13)TAP Portugal:
https://www.flytap.com/en-pt/transport-conditions

(14)Turkish Airlines:
https://www.turkishairlines.com/en-us/legal-notice/general-
conditions-of-carriage/index.html

Rev. 01/16/2020

## 36.   **Interline Transportation**

When Carrier undertakes to issue a ticket, check baggage, or make any other arrangements for transportation over the lines of any other airline on an interline basis (whether or not such transportation is part of a through service), Carrier will act only as agent for such other airline in these limited capacities, and will assume no responsibility for the acts or omissions of such other airline, including but not limited to providing flight status information, delays and other acts or omissions that arise from their flight operations.

Transportation on any interline partner is governed by that airline's contract or conditions of carriage. CARRIER SHALL NOT BE LIABLE FOR ANY DEATH OR INJURY TO A PASSENGER OCCURING ON A FLIGHT THAT IS NOT OPERATED BY CARRIER. In the case of transportation on a Carrier-operated flight as part of an interline itinerary, transportation is governed by Carrier's Contract of Carriage, except in the following areas where the interline partner's rules may apply:

> (1)   Baggage acceptance, policies and fees including, but not limited to, size, weight and quantity as well as acceptance of certain items, including musical instruments;
>
> (2)   Carriage of unaccompanied minors and/or young adults;
>
> (3)   Carriage of pets in the cabin of the aircraft;
>
> (4)   Policies for carriage of pregnant passengers; and
>
> (5)   Changes, cancellations and refunds.

With respect to baggage in particular, as required by the U.S. Department of Transportation, baggage service charges for your entire itinerary are determined by the marketing carrier for the first segment of your itinerary. Your originating marketing carrier is defined as the airline whose flight number is assigned to the first segment of your itinerary. If this airline is not Carrier, different charges may apply. Baggage service charges are those in effect on the date of ticketing.

In the case of transportation on a Cape Air flight, due to the size of Cape Air's aircraft and operational limitations, certain terms and conditions differ from those of Carrier, including:

> (1)   Policies and procedures for carriage of Assistive Devices for Qualified Individuals with a Disability (e.g. wheelchairs); and

Rev. 01/16/2020

(2) Policies and procedures for Qualified Individuals with a Disability. For example, Passengers must be able to climb three (3) stairs to board a Cape Air-operated flight with or without an assistant.

Carrier does not allow unaccompanied minors on flights with intermediate stops or on connecting flights, therefore, if travel involves transfer to or from an interline partner's flight, unaccompanied minors will not be allowed. However, an unaccompanied minor may be allowed to travel on an interline partner's non-stop itinerary. The interline partner's rules governing unaccompanied minors will apply and you may need to contact the interline partner directly.

For more information, please see the interline partner's contract or conditions of carriage.

(1) Aer Lingus:
http://www.aerlingus.com/i18n/en/htmlPopups/conds_of_carriage.html

(2) Aeroflot:
http://www.aeroflot.com/cms/en/before_and_after_fly/pact

(3) Air China:
http://www.airchina.com.cn/www/en/html/index/general_conditions_o/general_passenger/1006/

(4) Air India:
http://www.airindia.in/Images/pdf/Conditions_Carriage.pdf

(5) Air Italy:
https://www.airitaly.com/en-en/legalinfo/index.aspx

(6) Air Serbia:
https://www.airserbia.com/en/conditions-of-carriage

(7) All Nippon Airways:
http://www.ana.co.jp/wws/us/e/asw_common/siteinfo/conditions-of-carriage/

(8) Asiana Airlines:
https://flyasiana.com/C/US/EN/contents/terms-of-transportation-and-notification

(9) Avianca:
http://www.avianca.com/en-mx/contract-of-carriage.aspx

Rev. 01/16/2020

(10) Azul Linhas Aereas Brasileiras:
http://www.voeazul.com.br/en/flights-international/contract-of-carriage

(11) British Airways:
http://www.britishairways.com/travel/genconcarr/public/en_us

(12) Brussels Airlines:
http://www.brusselsairlines.com/en-be/misc/conditions.aspx

(13) Cape Air:
https://www.capeair.com/flying_with_us/carriage_05.pdf

(14) Cathay Pacific:
http://www.cathaypacific.com/content/dam/cx/legal-and-privacy/general-conditions-of-carriage-for-passengers-baggage-en.pdf

(15) China Airlines:
https://www.china-airlines.com/nl/en/terms-and-conditions/transportation-clauses

(16) China Eastern:
https://ca.ceair.com/newCMS/ca/en/content/en_Footer/AboutUS/201903/t20190328_4431.html

(17) China Southern:
https://global.csair.com/US/GB/booking-policy/international-carriage-conditions

(18) Condor Air:
https://www.condor.com/us/help-contact/gtbc.jsp

(19) Egyptair:
http://www.egyptair.com/en/Pages/Conditions-of-Carriage.aspx

(20) El Al:
http://www.elal.co.il/elal/english/terms_conditions/termsandconditions070108.html

(21) Emirates:
http://www.emirates.com/english/plan_book/essential_information/rules_and_notices/rules_notices.aspx

(22) Etihad Airways:
http://www.etihad.com/en/legal/conditions-of-carriage/

Rev. 01/16/2020

(23) EVA Air:
https://www.evaair.com/en-us/conditions-of-carriage/

(24) FlyDubai:
https://www.flydubai.com/en/information/policies/conditions-of-carriage

(25) Hainan Airlines:
https://www.hainanairlines.com/HUPortal/dyn/portal/DisplayPage?COUNTRY_SITE=US&SITE=CBHZCBHZ&LANGUAGE=US&PAGE=GCIC

(26) Hawaiian Airlines:
https://www.hawaiianairlines.com/legal/domestic-contract-of-carriage

(27) Iberia:
http://www.iberia.com/us/bills/conditions/

(28) Icelandair:
http://www.icelandair.us/information/about-icelandair/privacy-terms/

(29) Interjet:
https://www.interjet.com/en-us/legal-information/regulations-and-policies/contract-of-carriage

(30) Japan Airlines:
http://www.jal.co.jp/en/carriage/index_c001.html

(31) JSX:
https://www.jetsuitex.com/ContractofCarriage.pdf

(32) Korean Air:
https://www.koreanair.com/global/en/footers/terms-of-carriage.html

(33) LATAM Airlines:
https://www.latam.com/en_un/transparency/airport-transport-agreement-conditions/

(34) LIAT:
http://www.liat.com/UserFiles/File/Conditions%20of%20Carriage%20FINAL.pdf

(35) LOT Polish Airlines:
http://www.lot.com/us/en/web/newlot/conditions-of-carriage

Rev. 01/16/2020

(36) Lufthansa:
https://www.lufthansa.com/xx/en/business-terms-and-conditions-1

(37) Porter Airlines:
https://www.flyporter.com/travel/Conditions-Of-Carriage?culture=en-CA

(38) Qatar Airways:
http://www.qatarairways.com/us/en/conditions-of-carriage.page

(39) Royal Air Maroc:
http://www.royalairmaroc.com/us-en/Travel-Info/General-terms-and-conditions

(40) SATA:
https://www.azoresairlines.pt/en/information/customer-commitment/general-conditions-of-carriage

(41) Saudi Arabian Airlines:
https://www.saudia.com/help/useful-links/legal-and-terms-and-conditions/general-conditions-of-carriage

(42) Seaborne:
http://www.seaborneairlines.com/fly-with-us/contract-of-carriage/

(43) Silver Airways:
http://www.silverairways.com/docs/site/legaldocs/contract-of-carriage

(44) Singapore Airlines:
http://www.singaporeair.com/jsp/cms/en_UK/global_footer/conditions-carriage.jsp

(45) South African Airways:
http://www.flysaa.com/Journeys/conditions_of_Contract.action

(46) TAP Portugal:
https://www.flytap.com/en-pt/transport-conditions

(47) Turkish Airlines:
https://www.turkishairlines.com/en-pt/legal-notice/general-conditions-of-carriage/index.html

(48) Ukraine International Airlines:
https://www.flyuia.com/us/en/information/rules-and-regulations/carriage-agreement

Rev. 01/16/2020

**37.   JetBlue Airways Passenger Bill of Rights and Tarmac Contingency Plan**

   A.  GENERAL

   (1)  JetBlue has coordinated relevant portions of its Tarmac Contingency Plan with airport authorities at all U.S. large, medium, small, and no hub airports JetBlue serves, including U.S. large, medium, small, and no hub diversion airports.  JetBlue has sufficient resources to implement this Plan.

   (2)  For purposes of this Section 37, a "Passenger" means a Passenger, as defined in Section 1 and, except in the cases where a Non-Revenue Passenger may be entitled to compensation, shall exclude Non-Revenue Passengers except Passengers using TrueBlue Award Flights. Capitalized terms shall have the meanings as set forth in this paragraph and Section 1. All refunds of one-way or roundtrip travel under subsections C, D, E, or F, of this Section 37, shall exclude taxes and fees paid at the time of purchase. To the extent a Passenger is entitled to a refund but did not purchase travel through a Carrier booking channel (1-800-JETBLUE, jetblue.com or at the airport or a city ticket office), the Passenger will be responsible for contacting Carrier to obtain compensation under this Section 37, except subsection H. All refunds will be to the original form of payment. To the extent a Passenger booked travel using a TrueBlue Award, compensation under this Section 37 will be provided in the form of TrueBlue Points, except in the case of involuntary denied boarding.

   (3)  Passengers on JetBlue itineraries originating in a European Community state are not eligible for the compensation or relief described in this Section 37, except to the extent that the provision of any component of such compensation or relief is otherwise independently compelled by applicable local law or regulation and/or claimed consistent therewith.

   B.  INFORMATION

   JetBlue will notify Passengers of the following: known delays of thirty (30) minutes or more, cancellations, and diversions. Notification will be given in any of the following forms: via jetblue.com, via telephone upon request, on flight information display systems, via airport announcement, via onboard announcement, via email or via text message.

Rev. 01/16/2020

## C.  CANCELLATIONS

A Passenger whose flight is cancelled by JetBlue will receive, at the Passenger's option, a full refund or reaccommodation on the next available JetBlue flight in the same class of service at no additional charge or fare, except when a portion of the trip has been made. Any refund will be made in an amount equal to the applicable one-way fare for the portion of the trip cancelled or not operated as scheduled by JetBlue. In the case of a cancellation due to a Controllable Irregularity, where alternate transportation with a scheduled departure within one hour is unavailable, Passengers will receive the following compensation:

  (1)  Flights cancelled within four (4) hours of scheduled departure, Passengers are entitled to a Fifty Dollar ($50) Credit valid for future travel on JetBlue.

  (2)  Flights cancelled after scheduled departure, Passengers are entitled to a One Hundred Dollar ($100) Credit valid for future travel on JetBlue.

## D.  DEPARTURE DELAY

In the case of a Departure Delay that is caused by a Controllable Irregularity, Passengers will receive the following compensation:

  (1)  Flight delayed between 3 hours and 3 hours, 59 minutes after scheduled departure time, Passengers are entitled to a Fifty Dollar ($50) Credit valid for future travel on JetBlue.

  (2)  Flight delayed between 4 hours and 4 hours, 59 minutes after scheduled departure time, Passengers are entitled to a One Hundred Dollar ($100) Credit valid for future travel on JetBlue.

  (3)  Flight delayed between 5 hours and 5 hours, 59 minutes after scheduled departure time, Passengers are entitled to a One Hundred and Fifty Dollar ($150) Credit valid for future travel on JetBlue.

  (4)  Flight delayed for 6 or more hours after scheduled departure time, Passengers are entitled to a Two Hundred Dollar ($200) Credit valid for future travel on JetBlue.

Rev. 01/16/2020

E.   GROUND DELAYS ON ARRIVAL

In the case of a Ground Delay on arrival caused by a Controllable or Uncontrollable Irregularity, except those necessitated by a security event, Passengers will receive the following compensation:

(1)  Ground Delay between 1 hour and 1 hour, 59 minutes after scheduled arrival time, Passengers are entitled to a Fifty Dollar ($50) Credit valid for future travel on JetBlue.

(2)  Ground Delay between 2 hours and 2 hours, 59 minutes after scheduled arrival time, Passengers are entitled to a One Hundred and Twenty-Five Dollar ($125) Credit valid for future travel on JetBlue.

(3)  Ground Delay for 3 hours or more after scheduled arrival time, Passengers are entitled to a Two Hundred Dollar ($200) Credit valid for future travel on JetBlue.

F.   GROUND DELAYS ON DEPARTURE

In the case of a Ground Delay on departure, caused by a Controllable or Uncontrollable Irregularity, except those necessitated by a security event, Passengers will receive the following compensation:

(1)  Ground Delay between 3 hours and 4 hours, 59 minutes after scheduled departure time, Passengers are entitled to a One Hundred Dollar ($100) Credit valid for future travel on JetBlue.

(2)  Ground Delay for 5 hours and 5 hours, 59 minutes after scheduled departure time, Passengers are entitled to a One Hundred and Seventy-Five Dollar ($175) Credit valid for future travel on JetBlue.

(3)  Ground Delay for 6 hours or more after scheduled departure time, Passengers are entitled to a Two Hundred and Fifty Dollar ($250) Credit valid for future travel on JetBlue.

G.   GROUND DELAYS GENERAL

At all U.S. large, medium, small, and no hub airports JetBlue serves, including U.S. large, medium, small, and no hub diversion airports, JetBlue will provide Passengers experiencing a Ground Delay with food and drink (potable water) no later than two (2) hours after the aircraft leaves the Gate unless the Pilot-in-Command determines there is a safety or security-related reason for not doing so.  JetBlue will provide Passengers with, access to operable restrooms and, as necessary, medical treatment. In addition to the relief under subsections E and F of this Section, JetBlue will

51

not permit the aircraft to remain on a tarmac for more than three (3) hours for domestic flights or for more than four (4) hours for international flights unless the Pilot-in-Command determines there is a safety-related or security-related reason for remaining on the tarmac or Air Traffic Control advises the Pilot-in-Command that returning to the Gate or another disembarkation point elsewhere in order to deplane would significantly disrupt airport operations.

For Passengers traveling on a Carrier flight operated by a Codeshare Partner, please see Section 35, as the operating carrier's contingency plan (i.e., the Codeshare Partner's contingency plan) for a Ground Delay will apply.

H.  OVERBOOKINGS

Passengers, including those holding Zero Fare Tickets, who are involuntarily denied boarding as a result of an overbooking shall receive denied boarding compensation in accordance with Section 27. For the sake of clarity, a Passenger who responds to Carrier's request for volunteers and who willingly accepts Carrier's offer of compensation shall not be considered to be involuntarily denied boarding and shall not be entitled to denied boarding compensation under this Section 37 or Section 27.

38.  **Passenger Service Plan**

A.  Carrier sets forth its Passenger Service Plan below. Policies and procedures addressing the following areas are set forth in the documents hyperlinked. The hyperlinked documents are directional in nature, do not expressly form a term of this Contract of Carriage, and are subject to change from time-to-time.

(1)  Carriers fare rules are set forth in Section 6 of this Contract of Carriage. Additional rules may be set forth in close proximity to a particular fare. Passengers calling 1-800-JETBLUE or visiting our Carrier ticket offices or ticket counters will be offered the lowest available fare, exclusive of Internet only fares or special fares that may be offered for limited duration through particular booking channels, when specific dates and times are provided. In the event the lowest available fare is not quoted, Carrier's liability is limited to the difference between the fare quoted and the lowest available fare for which the Passenger was eligible at that time.

(2)  Carrier will notify Passengers of known delays of thirty (30) minutes or more, cancellations and diversions.

Rev. 01/16/2020

(3) Subject to the terms of this Contract of Carriage including but not limited to Sections 20 (Improperly Packaged and Damaged Items; Late Items), 25 (Failure to Operate as Scheduled), 26 (Relief for Failure to Transport / Failure to Operate) and 32 (Government Laws and Regulations), and applicable law, Carrier will endeavor to deliver baggage on time, including making every reasonable effort to return mishandled bags within twenty-four (24) hours, reimbursing Passengers for reasonable expenses that occur because of any delay on domestic flights or as required on international flights and reimbursing Passengers for any fees associated with transportation of a lost bag.

(4) Carrier is an instant purchase airline. Carrier does not hold reservations without payment.

(5) Carrier's rules regarding fare refunds are set forth in Section 4 of this Contract of Carriage. Subject to such rules, Carrier strives to provide credit card refunds promptly and cash or check refunds within twenty (20) days of receipt of all necessary information. This includes refunds of fees for optional services on flights from which the Passenger was bumped due to an oversales situation. Some fares are nonrefundable.

(6) Carrier will accommodate Passengers with disabilities and other special needs, including during Ground Delays consistent with its obligations under 14 CFR Part 382.

(7) Carrier will meet Passengers' essential needs during Ground Delays consistent with its obligations under 14 CFR Part 259.4.

(8) Carrier will treat "bumped" Passengers with fairness and consistency in the case of oversales consistent with its obligations under 14 CFR Part 250 and Section 27 (Denied Boarding Compensation) of this Contract of Carriage.

(9) Carrier discloses a Passenger's travel itinerary as follows:

(a) at the time a Passenger pays for a fare on-line; and

(b) in a Passenger's e-ticket receipt email.

Rev. 01/16/2020

(10) Carrier discloses the TrueBlue Frequent Flyer Rules as follows:

    (a) via http://www.jetblue.com/tb/terms.asp; and

    (b) at the time a TrueBlue Member logs into the TrueBlue program on jetblue.com; and

    (c) at the time a TrueBlue Member signs up via jetblue.com to become a member of TrueBlue or, in the case of Passengers who sign up via the JetBlue co-branded credit card, at the time a Passenger activates his or her TrueBlue Account.

(11) Carrier discloses the aircraft configuration as follows:

    (a) via http://help.jetblue.com/SRVS/CGI-BIN/webisapi.dll/,/?St=183,E=0000000000024436663,K=3792,Sxi=11,Case=obj(383379) ; and

    (b) by searching "aircraft configuration" under the "help tool" on jetblue.com.

(12) If a Passenger's travel is disrupted due to a Controllable Irregularity and the Passenger experiences a Departure Delay of six (6) of more hours, Carrier may, upon request from the Passenger, provide the following amenities: meal vouchers or pizza, and/or a hotel voucher.

(13) Carrier will notify Passengers in a timely manner of changes to their travel itinerary.

(14) Carrier will ensure responsiveness to consumer problems as required under 14 CFR Part 259.7.

## 39.   **Personal Information**

Carrier may use personal information collected from and about Passenger to perform the activities contemplated in this Contract of Carriage, including, but not limited to, Carriage, transfers to Codeshare Partners and other carriers, and transfers to government entities, as well as further described in Carrier's privacy policy available at https://www.jetblue.com/legal/privacy. Such personal information may be transmitted to the United States and other countries.

Rev. 01/16/2020

**40.   Governing Law/Section Headings/Waiver**

United States federal law shall govern any matter relating to or arising under this Contract of Carriage. To the extent any such matter is not preempted by federal law, the laws of the State of New York shall apply, without regard to conflict of laws principles. The section headings used in this Contract of Carriage are intended for convenience only and in no way define, limit or describe the scope or substance of any of the provisions of this document. If Carrier fails to enforce any of the sections of this Contract of Carriage or fails to exercise any election, such failure will not be considered to be a waiver of those provisions, rights or elections or in any way affect the validity of the Contract of Carriage.

**41.   Controlling Language**

English is the controlling language of this Contract of Carriage. To the extent there is any conflict between the English translation and another language translation, English controls.

*[End of Document]*

Rev. 01/16/2020

Electronically Filed by Superior Court of California, County of Orange, 08/21/2023 01:42:10 PM.
30-2023-01343576-CU-AT-CXC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By Jeanie Liu, Deputy Clerk.
CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Michael Merriman (SBN 234663)
655 West Broadway, Suite 900, San Diego, CA 92101

TELEPHONE NO.: 619-369-6232    FAX NO. (Optional):
E-MAIL ADDRESS: mmerriman@hilgersgraben.com
ATTORNEY FOR (Name): Daniel Nasr and the Proposed Class

FOR COURT USE ONLY

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
STREET ADDRESS: 751 W. Santa Ana Blvd.
MAILING ADDRESS: 751 W. Santa Ana Blvd.
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: Civil Complex Center

CASE NAME:
Daniel Nasr v. JetBlue Airways Corporation

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 30-2023-01343576-CU-AT-CXC |
|---|---|---|
| [x] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: Judge Randall J. Sherman DEPT.: CX105 |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[x] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [x] is [ ] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [x] Substantial amount of documentary evidence
   d. [x] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [x] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action (specify):
5. This case [x] is [ ] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: 8/21/2023

Michael Merriman
_____
(TYPE OR PRINT NAME)

*Michael Merriman*
_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name & Address)*:<br>Michael Merriman<br>655 West Broadway, Suite 900, San Diego, CA 92101<br><br>Telephone No.: 619-369-6232     Fax No. (Optional):<br>E-Mail Address (Optional): mmerriman@hilgersgraben.c<br>ATTORNEY FOR (Name): Daniel Nasr     Bar No: 234663 | FOR COURT USE ONLY |
|---|---|

| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**<br>Civil Complex Center - 751 W. Santa Ana Blvd., Bldg. 36, Santa Ana, CA 92701-4512 | |
|---|---|
| PLAINTIFF / PETITIONER: Daniel Nasr | |
| DEFENDANT / RESPONDENT: JetBlue Airways Corporation | |

| **CLASS ACTION/B&P 17200 QUESTIONNAIRE**<br><br>***(To be filed by counsel for plaintiff/s within 30 days of filing initial complaint)*** | CASE NUMBER:<br>    30-2023-01343576-CU-AT-CXC<br>DEPT: CX105<br>JUDGE: Judge Randall J. Sherman<br>STATUS CONFERENCE DATE: |
|---|---|

In response to the conflict of interest issues raised in ***Apple Computer, Inc. v. The Superior Court of Los Angeles County*** (2005) 126 Cal. App. 4th 1253, counsel for each proposed class representative is to provide the following information under oath to the Court:

1. Is any proposed class representative an attorney?     Yes _____    No _✓_

2. Is any proposed class representative a spouse, child or family member of plaintiff's counsel or of a partner or associate of the law firm of which plaintiff's counsel is a member?     Yes _____    No _✓_

    If yes, explain relationship: _____

3. Within the last 5 years, has any proposed class representative filed prior class action lawsuits using the same plaintiff's counsel or firm as in the present case?     Yes _____    No _✓_

    If yes, explain: _____

4. Does any proposed class representative have a business relationship with plaintiff's counsel, including but not limited to, the relationship of law partner, associate, employee, principal, agent, independent contractor, or professional corporation?     Yes _____    No _✓_

    If yes, explain relationship: _____

5. If there is co-counsel, have the attorneys been co-counsel in other class actions?     Yes _____    No _____

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

8/21/2023                       *Michael Merriman*
**DATE**                           **SIGNATURE OF COUNSEL FOR PLAINTIFF(S)**

**CLASS ACTION/B&P 17200 QUESTIONNAIRE**

Approved for Mandatory Use
L277 [New June 1, 2005]